308 A.2d 813.

CORNING GLASS WORKS *vs.* SEABOARD SURETY COMPANY.

AUGUST 16, 1973.

PRESENT: Roberts, C. J., Paolino. Kelleher and Doris, JJ.

242

KELLEHER, J.  On August 22, 1968, the manager of the Corning Glass Works plant in Central Falls, Rhode Island reported to the local police that sometime during the late evening hours of August 21, or the very early morning hours of August 22, some person or persons stole a rhodium and platinum stirrer which was valued in excess of $42,000. At the time, Corning had a fidelity policy issued by Seaboard Surety Company insuring against any loss caused by a fraudulent, dishonest, or criminal act committed by an employee, whether carrying on his nefarious activities by himself or in connection with others. Corning also had an all-risk policy issued by Appalachian Insurance Company. The Appalachian policy contained an express exclusion for damages caused by acts of a dishonest employee.

Each insurer points the finger at the other. Seaboard maintains that, since the evidence of employee dishonesty was circumstantial, there was a distinct possibility that the thievery was attributable to individuals other than Corning's personnel. Appalachian takes the position that

the theft was perpetrated by an employee working either alone or in collusion with others.

On May 9, 1969, Appalachian took a "loan receipt" from Corning. It was expressly understood that Corning would sue Seaboard and trial counsel would be designated by Appalachian. Suit was commenced in the Superior Court. A jury returned a verdict for Corning. Seaboard's motion for a new trial was denied and it has taken this appeal.

A brief factual setting will put the issues now before us in their proper focus.

Stirrers similar to the one stolen in Central Falls are used at some 82 Corning Glass Works plants located throughout this country and in other parts of the world. The stirrer is inserted into a gas furnace where it homogenizes molten glass. The homogenization process insures that the temperature of the molten mass remains constant. The stirrers are manufactured at Corning's New York headquarters. They are fabricated pieces of platinum and rhodium and weigh about 75 pounds. The stirrer is attached to a cast-iron shaft that weighs another 75 pounds. When joined together, the two parts have an overall length of 7 feet and a gross weight of between 150 and 175 pounds.

Corning's plant occupies an area equal to three blocks of Central Falls real estate. The plant is bounded by Broad Street on the west, Hunt Street on the north, Tremont Street on the south, and a railroad right-of-way on the east.

Sometime during the afternoon of August 21, 1968, a wooden crate containing a new stirrer arrived by air express in Providence. It was loaded onto a station wagon by Corning employees and transported to a loading dock located in the rear of the Central Falls plant. The crate was then carried a considerable distance from Building No. 4 to the furnace room of Building No. 9. A plant

mechanic was called back to work. He arrived at the furnace room at 5:30 p.m. He and a fellow employee opened the box and began the work of "lining up" the stirrer. During the "lining up" process, the mechanic and his assistant used a forklift truck to raise the stirrer. Once the stirrer was aligned, it was placed in a metal cabinet. The cabinet was secured by two large laminated padlocks. It was now 7 p.m. When the mechanic left the building, the apparatus was locked up in the cabinet, which is located on a wall just about 50 feet from an entranceway to another loading dock which fronts on Hunt Street. Entry at this point is had by lifting up a large overhead door. Since it was a sultry evening in August, this fact, combined with the extreme heat of the furnace room, required that the Hunt Street door be left open. There was a drop of approximately 5 feet from the furnace room floor to the Hunt Street sidewalk.

"Corning's Central Falls" operates on a 24-hour basis. A person who worked the 4 p.m.-to-midnight shift testified that sometime between 10:45 p.m. and 11:15 p.m. he observed the cabinet with its padlocks securely in place. However, an employee who worked the midnight-to-8 a.m. shift went into the furnace room at 11:40 p.m. and noted that the cabinet door was open. He gave it little thought because he assumed that the stirrer was still being processed prior to its insertion in the furnace.

There was no evidence of a forced entry into the cabinet. A Central Falls police officer described a scrape mark on the furnace room's cement floor that began at the cabinet and went to the overhead door entranceway. There was a dent in the Hunt Street sidewalk just under the loading platform. The officer then picked up a wheelbarrow trail that appeared to run along and over the railroad tracks to a baseball field which is northeast of and some distance from the Hunt Street loading dock. The

field bore the imprint of an automobile. In this area was found a wheelbarrow smeared with grease identified as part of the stirrer's lubricant. A resident of Hunt Street who was deceased at trial time had informed the police that at approximately midnight she heard a loud noise. When she went to her front window, she saw two men on the sidewalk in front of the dock carrying something that looked like a universal joint of a car. They crossed Hunt Street headed northeast in the direction of the ball field. Her description of the object she saw is a fair description of the stirrer's contour.

The first alleged error arose during the pleading stages of this suit. One justice of the Superior Court struck a portion of Seaboard's defense in which it claimed that Corning could not prevail in its claim because Corning had been fully compensated for the loss of the stirrer. Later, a second justice refused to permit Seaboard to plead the exclusionary provisions of the "other insurance" clause found in its policy.

Seaboard's defense of prior payment of the loss is premised upon the loan receipt Corning gave to Appalachian. However, some 40 years ago this court recognized the principle that the advancement by an insurer of an amount of a loss to its insured on condition that the insured will repay the insurer to the extent of the recovery received by the insured from a third party for the loss sustained constitutes a loan and is not to be considered as payment of the loss. *Colonial Finance Corp.* v. *Schacht Motor Truck Co.*, 52 R. I. 317, 160 A. 787 (1932).

Courts generally have found this type of insurance loan receipt to be an acceptable business practice and have given full effect to its terms. 13 A.L.R.3d 56, §5 (1967). The loan-receipt transaction performs a useful purpose in that it gives the insured a prompt supply of cash and protects the insurer's right of subrogation. Mr. Justice Bran-

deis has described the loan-receipt concept as an ingenious arrangement which serves the "needs of commerce and the demands of justice." *Luckenbach* v. *McCahan Sugar Refining Co.,* 248 U. S. 139, 149, 39 S.Ct. 53, 55, 63 L.Ed. 170, 176 (1918). We cannot fault the striking of the defense of prior payment.

Furthermore, Seaboard cannot rely on its "other insurance" clause for the simple reason that this exclusion by its very terms applies only when the other insurance covers the *same* risk as Seaboard's. Appalachian's policy specifically excluded from coverage loss due to an employee's dishonest actions. Each insurer was supplying a different type of coverage so that the other insurance clause never came into play.

Of the numerous objections to evidentiary rulings that have been briefed, only one requires discussion.

Corning's manager of corporate security testified. During cross-examination, he was asked if he had the names of any employee who alone or in collusion with others stole the stirrer. The witness answered in the negative. He was then asked if he had any factual information tending to show that an employee was implicated in the theft. His reply was, "No, just circumstantial." Later, in redirect, this witness described his training and experience in the area of industrial security. He is a college graduate with a degree in Industrial Security Administration. He was then asked to set forth the "circumstantial evidence" which led him to believe that the theft was, in the vernacular, an "inside job." He thereupon pointed to the inconspicuous place where the stirrer was stored—a cabinet that looked like any other cabinet, not a vault or a safe. This officer told of the limited number of plant personnel who knew the purpose of the cabinet. He emphasized that ordinarily a spare stirrer does not remain in a plant overnight. It is usually installed immediately and the used

stirrer is quickly returned to New York. Once the stirrer arrived in the loading area, it was brought to the premises by company personnel. It was carried through a number of buildings before it reached its ultimate destination. The security manager concluded his answers by remarking that in the light of what he just said, it would be difficult for an outsider to be aware of the situs of the stored stirrer. Seaboard's motion to strike the manager's answer was denied.

The trial justice's refusal to strike the manager's answer is erroneous but nonprejudicial.

Corning seeks to justify the refusal on the basis that the manager was an expert witness whose deductions would assist the jury in determining whether Seaboard was liable. We cannot agree.

In *Morgan* v. *Washington Trust Co.*, 105 R. I. 13, 249 A.2d 48 (1969), we recognized that when subjects of scientific, mechanical, or technical nature are before a jury, a witness who possesses a special knowledge in such an area can, by giving his opinion, assist the jury in its quest for the truth of the matter. However, we have also recognized that where circumstances can be fully and adequately described to a jury and are such that their bearing on the issue can be estimated by all men without specialized knowledge or training, opinion evidence is not admissible. *Glennon* v. *Great Atlantic & Pacific Tea Co.*, 87 R. I. 454, 143 A.2d 282 (1958); *Fontaine* v. *Follett*, 51 R. I. 413, 155 A. 363 (1931).

The jury in the present case needed no expert testimony. In fact, the trial justice in his remarks made it clear that he allowed the question and answer because the area had been opened up on cross-examination. We can see no harm to Seaboard by the trial justice's denial of its motion to strike.

248

■ Throughout this controversy, Corning has conceded that no arrests have been made and that it does not know the names of any employees who were responsible for the disappearance of the stirrer. It must be kept in mind that, in civil actions where a criminal act is the basis for recovery, the plaintiff is not required to prove the existence of the criminal activity by the beyond-a-reasonable-doubt standard. All that is necessary in such instances is that all issues of fact be resolved by a preponderance of the evidence. *Taglianetti* v. *New England Tel. & Tel. Co.,* 81 R. I. 351, 103 A.2d 67 (1954); *Nelson* v. *Pierce,* 18 R. I. 539, 28 A. 806 (1894). Corning is not attempting to convict an employee. All it seeks is payment under its contract with Seaboard.

Once the security manager had given his answer, the trial justice told the jury that the manager's opinion was only an opinion which was not binding on them. Furthermore, the witness's observations were merely cumulative.

One of the exhibits is a picture of the stirrer. To the unknowing eye, it looks just like any other piece of equipment that is likely to be found in any manufacturing plant. There is no dispute that shortly before the workers reported for the midnight shift, the cabinet was locked. Seaboard suggests that some outsider came in armed with a hacksaw and sawed off the laminated locks. It is inconceivable that any one would undertake such a project. The time required to cut the locks would be lengthy and the chance of a stranger being undiscovered in the furnace-room area were remote. Rather, it is more reasonable to infer that some employee who knew where the padlock keys were kept took the keys, opened the locks, and removed the stirrer. The facts relied on by the inspector had been gone into at length before he took the stand. Furthermore, a foreman testified that he checked the cabinet and the locks three times during his tour of duty on

the 4 p.m.-to-midnight shift and at no time did he see any strangers in the area. Stirrers were replaced at irregular intervals. We, therefore, believe that there was an abundance of evidence upon which the jury without the help of Corning's security specialist could and did decide with justification that the loss was a risk covered by Seaboard.

We see no reason to disturb the trial justice's denial of Seaboard's motions for a directed verdict and a new trial. Seaboard has failed to persuade us that he erred in denying its motions.

The final facet of Seaboard's appeal concerns the imposition by the trial justice of prejudgment interest. The jury returned a verdict of $37,159.03.[1] The trial justice, with the date suit was commenced as the initial date, added prejudgment interest of $5,945.12 so that the judgment entered on the verdict amounted to $43,104.15. Seaboard filed a motion asking that the interest be deleted from the verdict. The trial justice denied the motion. We affirm the denial.

Seaboard argues that prejudgment interest can be awarded only in those instances specified in G. L. 1956 (1969 Reenactment) §9-21-10. In essence, this section allows the imposition of interest from the commencement of an action seeking damages for personal injuries or property damage. Just recently we pointed out that the General Assembly enacted this legislation so that a plaintiff in a tort action could recover interest on his claim. *Isserlis v. Director of Public Works,* 111 R. I. 164, 300 A.2d 273 (1973). Prior to the enactment of §9-21-10, the general rule precluded the award of interest in an action of pure tort because by the very nature of the claim, damages

---

[1] The difference between Corning's reported loss to the police of over $42,000 and the amount of the jury's verdict is due to a $5,000 deductible clause in Seaboard's policy.

were wholly unliquidated. *Enterprise Garnetting Co.* v. *Forcier,* 69 R. I. 455, 31 A.2d 472 (1943).

The rule, however, is different in suits on a contract. Over a half-century ago, the court in *Pearson* v. *Ryan,* 42 R. I. 83, 105 A. 513 (1919), adopted the view that interest will be allowed in those instances when it seemed equitable to do so even where the person sought to be charged did not know the amount of the debt or damages, and when the time of its being due was fixed only by the demand for payment. In fact, in *Pearson* reference was made to Sedgwick, *Damages* §315 (8th ed. 1891), where the author observed, " 'Where interest is refused in actions of contract on the ground that the claim is unliquidated, it is in fact usually allowed from the date of the writ.' " *Id.* at 87, 105 A. at 514. Later on, in *Providence Transit Concrete Corp.* v. *New England Concrete Corp.,* 65 R. I. 430, 14 A.2d 807 (1940), interest from the inception of the suit to the date of judgment was approved.

Equitable considerations to one side, interest in a suit on an insurance policy commences to run from the time when the loss is made payable by the terms of a policy. *Old Colony Co-Op. Bank* v. *Yorkshire Ins. Co.,* 53 R. I. 439, 167 A. 111 (1933). In that case, the policy called for payment to be made within 60 days after proof of loss had been furnished. Interest was held to be payable commencing with the expiration of the 60-day period.

Seaboard's policy called for "affirmative proof of loss with full particulars" to be furnished within four months after discovery of the loss. Legal proceedings for recovery of the loss could not be instituted until two months following the submission of the proof of loss. Seaboard's policy, unlike the policy in the *Old Colony* case, contains no specific provisions as to payment of the claim. The record is clear that in early December, 1968, Seaboard was well aware of the amount of Corning's loss. On December

17 of that year Seaboard offered to settle the claim for 50 per cent of the loss. There is no question that, at the time the suit was instituted, the amount sought by Corning was fixed, the sole issue being liability. Corning has not sought interest from the date of denial of liability although there is support for such a position. 6A Appleman, *Insurance* §4024 at 21-24 (1972). Courts have expressed a number of diverse views as to when interest in a suit on an insurance policy is allowable. Interest has been held to be payable from (1) the date of the loss; (2) the date of the proof of loss; (3) 60 days (or any other period) after the proof of loss; (4) the denial of liability; (5) the commencement of the action; or (6) the verdict. 154 A.L.R. 1368 §III (1945).

In the absence of a contract concerning it, interest on a note is due only from the date of demand or default. Commencement of suit is the equivalent of a judicial demand. *Corrigan* v. *O'Reilly*, 82 R. I. 286, 107 A.2d 322 (1954). Corning's institution of suit was the judicial demand which triggered the running of interest.

In attempting to void the interest payment, Seaboard contends that the trial justice, by adding the interest, barred Seaboard from showing that it has offered to pay part of Corning's loss. Apparently, Seaboard believes that this tender in some way tolled the running of interest either in whole or in part. The rule of tender envisions the insurer offering to pay the entire amount found to be due under the policy. If the tender falls short of that sum, interest runs on the whole. *Relyea* v. *Pacific Fire Ins. Co.*, 124 Conn. 654, 2 A.2d 377 (1938); *Hartford Fire Ins. Co.* v. *Roger Wilson, Inc.*, 252 So.2d 161 (La.App. 1971); *J. Purdy Cope Hotels Co.* v. *Fidelity-Phenix Fire Ins. Co.*, 126 Pa. Super. 260, 191 A. 636 (1937).

Finally, we are not persuaded that the award of interest will unjustly enrich Appalachian because Appalachian has,

by its willingness to cooperate with its insured and participate in the loan-receipt arrangement, lost the use of $37,-159.03 for a period of time which is longer than the time this suit has been pending in the Superior Court. Having in mind Mr. Justice Brandeis' sagacious comment as to a loan-receipt transaction, we see no reason to disturb the award of interest on the basis of unjust enrichment. While the loan receipt calls for an interest-free loan, the interest due from Seaboard in equity belongs to Appalachian. Any other view would unjustly enrich Seaboard.

The defendant's appeal is denied and dismissed.

Mr. Justice Joslin did not participate.

*Higgins, Cavanagh & Cooney, Kenneth P. Borden,* for plaintiff.

*Gunning, LaFazia, Gnys & Selya, Inc., Raymond A. LaFazia, J. Renn Olenn,* for defendant.