ELLEN G. MCCALL *vs.* FLORIAN LAFERRIERE.
HELEN M. MCCALL *vs.* SAME.

JANUARY 25, 1952.

PRESENT: Flynn, C.J., Capotosto, Baker, Condon and O'Connell, JJ.

CONDON, J. These actions of trespass on the case for negligence were tried together in the superior court and resulted in verdicts for the defendant. Thereafter the trial justice granted each plaintiff's motion for a new trial. Each case is here on defendant's bill of exceptions to those rulings and to the denial of his motion for a directed verdict in each case.

On our view of the evidence it will not be necessary to treat the exceptions to the denial of defendant's motions for directed verdicts. After a careful examination of the transcript and exhibits we are of the opinion that the rulings of the trial justice granting plaintiffs' motions for new trials are erroneous for reasons hereinafter set forth.

The trial justice set aside the verdicts because he was of the opinion that they were against the great preponderance of the evidence. He reached such conclusion apparently by rejecting, as unworthy of belief, defendant's testimony as to how the collision occurred; by refusing to consider certain photographs as proper evidence although, over plaintiffs' objection, he had admitted them for the consideration

176

of the jury; and finally by placing great stress on the testimony of two of plaintiffs' witnesses.

The defendant contended that the trial justice misconceived the evidence in certain important particulars; that he erred in refusing to consider the photographs; and that he otherwise failed to evaluate the evidence before him correctly. For those reasons he argues that the weight usually accorded by this court to the ruling of a trial justice granting a new trial should not be given to it here but that we should examine the evidence independently and unless we find that the *great* weight of it favored the plaintiffs we should overrule the trial justice and order judgment entered on each verdict.

The evidence as we view it substantiates these contentions. It seems to us that the jury were not only warranted in crediting the defendant's testimony and considering the probative force of the photographs, but they were also justified in drawing inferences from the testimony of plaintiff Helen M. McCall and some of her witnesses which were unfavorable to her and which the trial justice apparently overlooked. The reasons for our opinion will appear in the following discussion of the evidence.

These cases arose out of a collision on a public highway between a Dodge sedan driven by defendant and a Buick sedan operated by plaintiff Helen M. McCall but which was owned by her mother, plaintiff Ellen G. McCall. Helen was using it on a mission of her own with her mother's express consent. Mrs. McCall sued defendant for damages to the Buick resulting from the collision, and at the trial she contended that she was not bound by the negligence of Helen, if any. The trial justice, however, charged the jury to the contrary and she is pressing no exception thereto. The law thus given to the jury became the law of her case and made it dependent upon the outcome of Helen's case. Therefore, we shall hereinafter confine our discussion to the latter as though it were the only case before us.

The collision occurred just north of Hunt River bridge on the Post Road in North Kingstown at about 1 a.m. on April 23, 1943. At that time and place the road had a cement pavement with a white line painted down the middle dividing it equally for two lanes of traffic on each side. The road runs generally north and south so that the northbound traffic lanes were east of the center line and the southbound lanes west of it. On the easterly and westerly sides of the road adjacent to the cement pavement were hard surface shoulders slightly wider than ten feet. Immediately west of the westerly shoulder was a bank a little more than five feet high. Both to the north and to the south of the bridge the general level of the road was lower than that of the bridge. North of the bridge the road sloped downward and curved to the right or easterly. A northbound vehicle after crossing the bridge had to veer toward the right in order to negotiate the curve; otherwise it would not remain on the right side of the white line but would tend to go across the line in a generally northwest direction.

The plaintiff's car, northbound, had completely crossed the bridge when it collided with defendant's southbound car. How the collision occurred and where the cars came to rest immediately afterward are matters in sharp controversy between the parties. The defendant testified that he was driving southerly on his right or west side of the road; that as he approached the bridge a car came over it headed right towards him; and that it was not a minute before the cars came together. He further testified that a passenger riding with him on the front seat, who was instantly killed, ejaculated: "The fool * * * is coming towards us." The defendant also testified that he was taken to the hospital where he remained for six months with multiple fractures and that he could not recollect what happened after the cars came together.

The plaintiff testified that she was driving north at the rate of 35 to 40 miles per hour as she approached the

bridge, that she recalled she was on her right or east side when she drove across it, but she was not sure which side of the road she was on when she was hit. She did not know what happened, and could not remember anything that happened after she drove over the bridge and before she woke up later in the hospital. She admitted that she had a cocktail about 10 p.m. just before dinner at the Kingstown Inn. She denied having had more than one. She also testified that Ensign John Humphrey was riding on the front seat with her; that she had been his guest earlier in the evening at the Quonset Naval Air Station; and that he was accompanying her to Providence. He did not testify. If anything happened to him as a result of the collision, the record is silent about it. The plaintiff admitted at the trial that she had not tried to obtain his testimony although she knew he was then residing in Roland, Missouri. She also admitted that she had no license to operate a car at the time of the accident and that she did not obtain one until several years afterward.

Her testimony manifestly did not prove anything to support her case against the defendant. On the contrary it was reasonably open to unfavorable inferences against her. The trial justice apparently recognized this fact and expressly put her testimony to one side and relied almost wholly for support of his ruling setting aside the verdict on the testimony of Leonard O. Warner, a newspaper reporter, and Morris Weinstein, a public utility bus driver. He attributed special weight to Warner's testimony whom he characterized as a "trained observer" because of his calling as a newspaper reporter. Aside from the fact that there is nothing in the evidence which stamps him as such an observer we fail to see wherein his testimony is entitled to any unusual probative force in proving that defendant negligently drove into plaintiff's car. Indeed his lack of recollection at the trial of what he saw as he came upon the scene of the collision would indicate that his powers

of observation were not above the ordinary, at least on that occasion.

He admitted that he did not actually see the collision but came upon the scene immediately afterward as the two cars were coming to rest. He was driving his automobile north about 600 feet behind plaintiff's car as it approached the bridge. When it crossed the bridge and started down on the other side it was lost to his view but then he heard the impact of the cars as they collided and almost immediately he came upon them. He testified that the cars came to rest with plaintiff's on the extreme left or west side of the road and defendant's on the right where he had last seen plaintiff's car. He testified that he did not know where the plaintiff was after the collision; that his mind was hazy about it, but that he recalled he placed her on a cushion from one of the cars and that she was semiconscious. On cross-examination he was indefinite as to the position of defendant's car immediately after the collision but thought part of it was east of the middle line. He also testified that the dead man was near the running board of defendant's car in the middle of the road, that is, the middle of the fourth lane. Obviously by the "fourth lane" here he means the extreme westerly lane. He stayed around probably fifteen or twenty minutes until the ambulance came but he did not know whether the cars were moved before the state police arrived.

We think it is significant that plaintiff called Warner as a witness but failed to call a Miss Cochran who was riding beside him and who incidentally was also a member of the press. Indeed Warner testified that she assisted him in making a report of the accident to their newspaper. At the time of the trial she was residing in Orleans, Massachusetts, but plaintiff offered no explanation as to why she did not obtain her testimony. Miss Cochran was apparently in as favorable a position as Warner to observe conditions at the scene of the accident and in so far as a newspaper

reporter *ipso facto* may be said to be one she too was a "trained observer."

Another fact not to be ignored is that while Warner knew that a man had been killed as a result of the collision and that the state police were investigating the accident, he never reported to them what he saw, but several years later volunteered to testify for the plaintiff when her father asked him to do so. Moreover his recollection was hazy on certain incidents, leading up to his willingness to testify voluntarily, which were competent for the jury to consider in evaluating his testimony. The trial justice does not seem to have noticed these circumstances attending the testimony of Warner and the calling of him as a witness.

In our opinion such circumstances were inseparably connected with a proper evaluation of the evidence and could very well have unfavorably impressed the jury. And Miss Cochran's absence from the witness stand could well have given rise to an inference in their minds that her testimony would have been unfavorable to the plaintiff. Moreover, an even stronger inference of a like unfavorable character could have been drawn by them from the failure of the plaintiff to obtain the testimony of her personal friend, Ensign Humphrey, who certainly must have been in the best position of all to testify as to the manner in which she drove her car and whether or not defendant had negligently driven his car partly across the center line and into her car causing the collision. This court has heretofore approved the drawing of such inferences. *Huebel* v. *Baldwin,* 45 R. I. 40, 45. In that case it said: "The jury properly might infer that the failure to call an available and material witness by the party who naturally is expected to produce such witness was an admission that the testimony of such witness would be unfavorable."

The other witness for the plaintiff, Morris Weinstein, on whom the trial justice relied, testified that on the night in question he was driving his bus to Quonset behind a line of five automobiles for more than a quarter of a mile

and those automobiles kept the same position before reaching the scene of the accident; that the fifth one from him was a Dodge sedan to which his attention was attracted because it was "bobbing in and out from one lane to the other every so often"; and that this car just before the accident went from one lane practically to the other and back again; that before the collision defendant went over to the left-hand side of the road and that plaintiff's car coming down hit defendant's car and it landed in the middle of the road. Weinstein testified further that plaintiff's car was on its right-hand side and it did not "cut to the left" before the accident. But he also testified that when the cars collided they were on the right-hand side of the road, "my right"; that after they collided they went to the right-hand, which was the west, side of the road; that he went by them in the third lane; and that the cars were then way over on the left-hand side going north. He testified further that he did not stop but drove to Quonset and after staying there about twenty minutes he started to return to Providence, and that as he passed the scene of the accident the cars were on the extreme left-hand side of the road, which from his direction would be the west side, and that they had been moved.

From an examination of his testimony it appears that he was not entirely clear in his own mind as to the purport of some of the questions addressed to him concerning the place where the cars collided. Certainly on that point it is open to more than one reasonable conclusion, as it is on the question whether the cars were moved after the accident and before Obie Fields, a state trooper, arrived at the scene. He testified that he arrived between 1:15 and 1:30 a.m. and at that time the plaintiff's car was on the west side of the road headed in a northwesterly direction with its right rear wheel just on the edge of the cement, the left rear 5 feet 6 inches west, the right front 6 feet west of the westerly edge, and the left front 10 feet 9 inches west. These measurements were made by him on his arrival on

the scene. He further testified that the right rear wheel of defendant's car was 6 feet west of the white line, the left rear 9 feet 3 inches west, the right front 13 feet 2 inches west, and the left front 16 feet 8 inches west. He also testified that the position of the cars was 450 feet north of the center of the bridge. He called for a state photographer and stayed at the scene until he arrived. The cars were not moved while he was there nor before the photographer took several photographs. These photographs portrayed the cars on the road as the trooper had described them, and over plaintiff's objection they were admitted in evidence as exhibits.

Later, on considering plaintiff's motion for a new trial the trial justice doubted the admissibility of these photographs. However, having admitted them for the consideration of the jury it was not within his province to ignore such evidence in passing upon the question whether their verdict was against the weight of the evidence. The photographs tend to corroborate the testimony of defendant as to where the collision occurred and to contradict the unsupported general assertion of Weinstein that on returning from Quonset he saw that the cars had been moved.

Having in mind that plaintiff had the burden of proving that she was free from contributory negligence as well as proving the negligence of the defendant, we cannot say that the great weight of the evidence and the inferences to be drawn therefrom are contrary to the verdict. In the circumstances therefore it should not be disturbed. *Bradley* v. *Brayton*, 61 R. I. 44.

The defendant's exception to the granting of plaintiff's motion for a new trial in each case is sustained, and each case is remitted to the superior court for entry of judgment for the defendant on the verdict.

*Sherwood & Clifford, Sidney Clifford, Raymond E. Jordan,* for plaintiffs.

*Francis V. Reynolds, Joseph V. Cavanagh,* for defendant.