311 A.2d 288.

KARL ANDERSON *vs.* FRIENDSHIP BODY AND RADIATOR WORKS, INC. *et al.*

NOVEMBER 16, 1973.

PRESENT: Paolino, Joslin, Kelleher and Doris, JJ.

446

KELLEHER, J. This is a civil action in which the plaintiff seeks damages for the conversion of his automobile. The matter was tried to a justice of the Superior Court sitting with a jury, and thereafter a verdict was returned for the plaintiff in the sum of $2,800 which represented $1,300 as the fair market value of the automobile and $1,500 as punitive damages. Subsequently, the defendants' motion for a new trial was denied, and they are now in this court prosecuting this appeal. Hereafter, we shall refer to the plaintiff as "Anderson," the corporate defendant as "Friendship," and the individual defendant, Selwyn Kirshenbaum, as "Kirshenbaum".

In mid-1969 Anderson was the owner of a 1965 Chev-

rolet Super Sport Impala Convertible. The car had a custom paint job, oversized tires, raised springs, two four-barrel carburetors, and a complete stereo music system. In the language of the day, the car had "pizzazz". The "pizzazz" had been supplied by Friendship at a total cost to Anderson of about $1,500. Anderson was a steady customer of Friendship and when he was not beautifying the car, he would have the "Super Sport" serviced for such non-super things as an engine tuneup, new spark plugs, or the addition of fluid to the transmission.

On June 3, 1969, Anderson's car was taken to Friendship for repair and replacement of various portions of the ignition system. The bill for this work amounted to $112.75. Anderson picked up the car on the following day and paid $20 on account. During the next month and a half, Anderson's car was in and out of Friendship's premises for service or repairs. Toward the end of July, 1969, Anderson decided to sell the Super Sport.

One of his potential purchasers was Ralph Shippee, an employee of Friendship's. On July 24, 1969, Anderson drove to Friendship's premises. He parked his vehicle on the street and met Shippee. Shippee took over as the driver and road tested the car for about five minutes. Upon his return to his place of employment, he parked the vehicle in the interior of Friendship's garage. Someone closed the garage's automated doors and Kirshenbaum took possession of the car keys. He informed Anderson that the car would remain in the shop until the balance due Friendship was paid. At that point, so far as Anderson was concerned, friendship at Friendship's was no longer a viable commodity. This suit ensued.[1]

---

[1]Once Anderson's counsel demanded possession of the vehicle, Friendship issued a writ of attachment. Eventually the Super Sport was sold at a sheriff's sale. The purchase price was $420. The trial justice would not permit Friendship and Kirshenbaum to introduce this evidence as he

Kirshenbaum testified that the impoundment of the car was based on an agreement with Anderson wherein Anderson agreed that in the event he did not pay the balance due on the June 3 repairs, Friendship would pick up the car. Anderson, on the other hand, claimed that there was no agreement. According to him, Shippee's actions in driving the Super Sport off the highway and parking it in Friendship's garage were part of Kirshenbaum's plan to regain possession of the car and then assert a repairman's lien.

This is a three-faceted appeal. The defendants contend that the trial justice erred in permitting an automobile dealer to give an expert opinion as to the reasonable value of Anderson's vehicle; that error was committed when the trial judge refused to charge on the so-called "empty chair" doctrine; and finally, that remarks made by the trial justice during the course of the trial prejudiced their defense and deprived them of a fair trial. We do not agree.

## The Expert

Whether a witness qualifies as an expert is a matter which is addressed to the discretion of the judge presiding at the trial and such discretion will not be disturbed absent a showing of an abuse of that discretion.[2] *Cooper* v. *Housing Authority*, 105 R. I. 126, 249 A.2d 904 (1969); *Atlantic Refining Co.* v. *Director of Public Works*, 102 R. I. 696, 233 A.2d 423 (1967); *Redding* v. *Picard Motor Sales, Inc.*, 102 R. I. 239, 229 A.2d 762 (1967).

----

felt the price received was not a reliable indication of the vehicle's value because it came about from a "forced sale". The exact amount of the balance due Friendship was never resolved. It ranges from $142 to $242.

[2] According to Wigmore, the rule of the future will bar any appellate review of the trial justice's evaluation of the experiential qualifications of a particular witness. 2 Wigmore, *Evidence* (3d ed. 1940) §561 at 641-643.

The automobile dealer testified that the Super Sport was worth $1,300 at the time of the shutting of the doors and the grasping of the keys. The witness was the owner of a Ford dealership. He had been in the business for 22 years during which time he was personally involved in the buying and selling and appraisal of both new and used cars. During this interval, he also served as chairman of the state Motor Vehicle Dealers' Licensing Commission for about a decade. In giving his opinion as to the car's worth, the dealer emphasized that his appraisal was based upon his experience in the business and an analysis of several trade publications.

The subject matter of the dealer's opinion was unquestionably beyond the ken of the average juror. Expert testimony would be an indispensable aid to the jury in its quest to discover the truth. In *Morgan* v. *Washington Trust Co.,* 105 R. I. 13, 249 A.2d 48 (1969), we observed that a witness may acquire the necessary expertise which will permit him to show his skill with the jury in a number of ways, be it by way of "study, observation, practice or experience." The dealer's years of experience could and did prove to be of immeasurable assistance to the jury as it came to grips with that portion of Anderson's claim relating to damages.

The defendants challenged the trial justice's ruling on the dealer's expertise on the basis that he had never bought or sold an automobile identical to Anderson's customized convertible. This contention is misdirected. A similar argument was presented in *St. Jean* v. *Lippitt Woolen Co.,* 69 A. 604 (R. I. 1908). There, the trial court had allowed a man who had worked with machinery for 40 years to testify as an expert. Subsequently, it developed that the witness had not used a machine that was similar to the one in dispute. Such a failing, it was held, was a factor

affecting the weight to be accorded to the expert's testimony but not his competency.

The defendants also fault the expert because of his failure to check such matters as the car's engine, its undercoating, its interior, and whether it came equipped with a spare tire and a jack. These answers are matters that go to weight rather than competency.

On the record before us, we find no abuse of discretion in permitting the dealer to testify as to the reasonable value of Anderson's Super Sport.

## The Empty Chair

This court has adhered to the rule that a litigant's failure to produce an available material witness who would be expected to testify in his behalf may allow the fact finder to infer that had the missing witness appeared and testified, his testimony would have been adverse to the litigant's interest. *McCall* v. *Laferriere,* 79 R. I. 174, 86 A.2d 46 (1952). The defendants sought the benefit of this principle because of Anderson's failure to call two friends who were present at various times when he went to Friendship's premises. The trial justice refused to inform the jury of the rule in the *McCall* case.

Since *McCall* was decided, we have stressed that the trier of fact is not compelled to draw the unfavorable inference. *Lantini* v. *Daniels,* 104 R. I. 572, 247 A.2d 298 (1968). Within recent months, we recognized that the empty-chair doctrine is to be applied with caution so that as a condition precedent to its invocation, there must be a showing of the missing witness's availability to the person who would be expected to produce the witness; and before the court begins its instructions, the party seeking to gain the benefit of the unfavorable inference must make it known that he is going to ask that the jury be informed as to the thrust of the doctrine. *Benevides* v. *Canario,*

111 R. I. 204, 301 A.2d 75 (1973). Furthermore, if the witness is equally accessible to both parties, no inference can spring from the failure of either party to call him. *Kean* v. *C. I. R.*, 469 F.2d 1183 (9th Cir. 1972); 2 Wigmore, *Evidence* (3d ed. 1940) §288, n.1 at 169. Finally, the inference is not operable where the witness's testimony would be merely cumulative to what has been already adduced at the trial. *General Electric Credit Corp.* v. *Aetna Cas. & Sur. Co.*, 437 Pa. 463, 263 A.2d 448 (1970); 2 Wigmore, *supra,* §287 at 168. Since the threat of the inference being drawn can invite the possibility of a courtroom full of unnecessary witnesses, the judicious use of discovery procedures can serve to diminish the justification and the need for the inference. McCormick, *Evidence* (2d ed. 1972) §272 at 657.

When the question of the absence of Anderson's friends arose, the trial justice, in denying defendants' motion that the trial be continued until the friends appeared in court in reply to defendants' summons, suggested to their counsel that they proceed with their evidence and in the meantime issue the necessary process. Anderson's counsel informed the trial justice that he had intended to present the friends as witnesses but changed his mind without informing the defense counsel. However, he offered to give the telephone numbers of the absentees. He explained his change of mind by pointing out to the court that the trial before him was the third time that this matter had been litigated. The suit was instituted originally in the District Court. There, judgment was entered for Anderson. Friendship and Kirshenbaum took an appeal to the Superior Court. The jury returned a verdict for Anderson but gave inconsistent replies to certain written interrogatories. The inconsistency required a retrial which is the trial presently under our review. The friends had testified at each of the other trials at some personal sacrifice and

Anderson's counsel informed the court of his belief that subpoenas by his client for a third trial could produce an adverse effect in Anderson's case.

It was also shown that the friends' testimony could be classified as cumulative because they were not present at the time of the alleged agreement between Anderson and Kirshenbaum. While they might testify as to the taking of the keys or the impounding of the car, there was no dispute that these two incidents did in fact occur. The friends could not testify as to the existence of the agreement.

We believe the record shows quite clearly that Anderson's friends were as accessible for a summons to be served by defendants as process served by Anderson; that their testimony was purely cumulative; and that their absence from the courtroom was understandable.

There was no error in refusing defendants' request for instructions relating to the so-called empty-chair doctrine.

## The Remarks of the Trial Justice

Nobody can argue with the proposition that a trial justice, as he presides at a trial, should be cautious and circumspect in his language and conduct and that he refrain at all times from uttering any remarks that may injure a litigant in the eyes of the jury. However, the dispute arises in the application of this rule because, in addition to being fair and impartial, the trial justice is charged with the responsibility of expediting the trial and hopefully keeping counsel's questioning focused on the issue in dispute.

With these observations as a background, let us look at what faced the trial justice as he tried to be fair and at the same time keep the questioning relevant. The attorney for defendants is the brother of one of the defendants. The corporate defendant is a family corpora-

tion. Understandably, at times, defense counsel seemed to be defending the family name rather than being the detached dispassionate advocate that he can be. In addition, due to several acrimonious exchanges between both counsel, although not within the hearing of the jury, the trial judge had to act as if he were negotiating a cease-fire accord.

In his zeal to protect his clients' interest, defense counsel repeatedly pursued lines of questioning after the trial justice ruled that this type of inquiry was improper. Finally, the trial justice rebuked counsel. We find nothing improper in what he said. The trial judge made it quite clear that he was seeking to expedite the proceedings before him. The language he used, while somewhat pointed and abrupt, was designed to get the trial back in focus and alert both counsel to deal with the legal principles instead of personalities.

From our examination of the record, we find no unfairness exhibited towards defense.

The issue before the jury was simple: Was there or was there not an agreement whereby the defendants could retake the Super Sport because of the money due Friendship? The jury found that there was no such agreement and we see nothing in the remarks made by the trial justice that lead us to believe that his conduct could have prejudiced the defendants in the eyes of the jury.

The defendants' appeal is denied and dismissed.

Mr. Chief Justice Roberts did not participate.

*Adler, Pollock & Sheehan, Peter Lawson Kennedy,* for plaintiff.

*Kirshenbaum Law Offices, Incorporated, Allen M. Kirshenbaum,* for defendants.