Rayna ROMANO p. a. Pio Romano

v.

ANN & HOPE FACTORY OUTLET, INC. et al.

Nos. 78–64–Appeal, 78–167–Appeal.

Supreme Court of Rhode Island.

Aug. 4, 1980.

Decof, Weinstein & Mandell, Martin W. Aisenberg, Providence, for plaintiffs.

Hanson, Curran & Parks, Dennis J. McCarten, Gunning, LaFazia & Gnys, Edward L. Gnys, Jr., Providence, for defendants.

## OPINION

KELLEHER, Justice.

This is a products-liability case in which Pio Romano, father of the minor plaintiff, Rayna Romano, instituted an action in Superior Court to recover for her personal injuries. The 1973 suit alleged that Rayna received permanent injuries when she fell from a bicycle purchased from the defendant, Ann & Hope Factory Outlet, Inc. (Ann & Hope), on August 8, 1970. The Romanos contend that the bicycle's defectively designed coaster brake precipitated Rayna's injuries.

The defendants are Ann & Hope, Raleigh Industries, Ltd., and Sturmey-Archer Gears, Inc. This litigation, which involves claims of negligence, strict liability, and breach of warranty, was finally reached for trial in the Superior Court on April 29, 1977. On that date, the Romanos appeared and requested a two-week continuance in order to permit them time to change their counsel. Although the trial justice granted the continuance, Rayna's father appeared without counsel two weeks later and indicated that the newly engaged trial counsel would require additional time to prepare. The trial justice continued the case to the September calendar on the condition that no further discovery be conducted.

The case was subsequently tried before a justice of the Superior Court sitting with a six-person jury. At the close of the Romanos' evidence, the trial justice directed verdicts for all the defendants.[1] The Romanos are now before us on a multifaceted appeal challenging the correctness of several evidentiary rulings by the trial justice as well as the propriety of prohibiting discovery.

The allegedly defective bicycle, a twenty-inch boy's model "Oxford" bicycle with a banana seat and high-rise handlebars, was purchased preassembled by Rayna's grandparents for her younger brother, John. The braking mechanism bore the inscription "Sturmey-Archer '69." At the time of their purchase, Rayna's grandparents received no maintenance instructions. Although Rayna and her older brother, Pio, already owned bicycles, each youngster customarily rode whichever bicycle was closest at hand. Testimony revealed that the "Oxford" bicycle functioned satisfactorily for just over a year.

On September 9, 1971, Rayna, then seven years old, mounted the "Oxford" bicycle and started down the steep hill on which the Romano home was located. The Roma-

---

1. The verdicts directed by the trial justice for the defendants on September 21, 1977, erroneously included Raleigh Industries of America, Inc. However, an amended complaint filed on September 14, 1973, substituted Raleigh Industries, Ltd. for Raleigh Industries of America, Inc.

nos lived in Cranston on Bellevue Drive. As Rayna rode down the street, she applied the brakes "halfway" in order to keep the bicycle speed under control, but as she approached a bend in the road, the brakes failed, causing the bike to strike a curb at the foot of the hill. As a result of the impact, Rayna flew over the handlebars and hit a tree. She was hospitalized for extensive periods of time for a variety of injuries, including a fractured skull.

On appeal, the Romanos first argue that the trial justice abused his discretion and committed reversible error when, in granting their request for continuance, he prohibited further discovery. They concede that "the trial court has broad discretion in shaping and guiding the course of discovery." Before one can take issue with the exercise of judicial discretion, however, an objection must be "properly taken to a ruling by the trial court on a motion clearly and expressly stated." *Cavanagh v. Cavanagh*, 118 R.I. 608, 625, 375 A.2d 911, 919 (1977); *Manekofsky v. Baker*, 92 R.I. 377, 380, 169 A.2d 376, 378 (1961). In the present controversy, the trial justice's order granting the continuance upon the condition that discovery be prohibited was made on May 13, 1977, when the Romanos, still unrepresented by counsel, did not object. Moreover, when the newly acquired counsel entered his appearance on May 25, 1977, he did not move to have the restriction on discovery vacated. In light of these factors, we find that the Romanos did not preserve the prohibition-of-discovery issue for appeal.

The Romanos also challenge numerous evidentiary rulings made by the trial justice. Of these, we feel that a discussion of the exclusion by the trial justice of the testimony of the Romanos' expert on issues of defective design and causation is dispositive. Throughout this litigation the Romanos have claimed that the defect was a plastic fixture consisting of an oil cap which is attached to the top of a narrow tube. The entire fixture measures approximately one-quarter of an inch in length. The fixture is fitted into a hole found on the hub of the rear wheel. The brake chamber is lubricated by lifting the cap and letting the oil flow down the tube into the chamber. Hereafter we shall refer to the plastic fixture as the "plastic cap."

For the most part, maintenance of the "Oxford" was the responsibility of Rayna's older brother, Pio. He told the jury that prior to Rayna's unfortunate descent the plastic cap was missing from the "Oxford." Pio could not be specific as to the time when he first noticed the cap's absence. The Romanos have argued with great vigor that the trial justice committed reversible error when he prohibited their expert, Leonard Mandell (Mandell), from telling the jury that a plastic cap should never have been used because the cap could not be securely threaded into the hub's oil hole because the cap's plastic threads were destroyed once they were turned against the metal threads of the oil hole. If permitted, Mandell was prepared to tell the jury that the lack of this cap allowed debris to enter the brake chamber and oil to escape from the chamber—two conditions which, in Mandell's opinion, caused the brake failure.

In April of 1973, Mandell, a consulting engineer with a master of science degree in mechanical engineering, conferred with the Romanos at their home. As a result of their meeting, he took the bicycle to his laboratory where it was photographed and tested. Unfortunately by the time the case was reached for trial in September 1977, the bicycle, together with Mandell's detailed notes regarding his investigation of the internal braking mechanism, had disappeared. According to Mandell, the bicycle was either taken when his office and laboratory were repeatedly burglarized sometime after September 1974, or it was "released somehow." Notwithstanding the unavailability at trial of the bicycle and the notes, Mandell was prepared to testify concerning the condition of the internal braking mechanism when he dismantled it in April of 1973.

The attorney for Ann & Hope objected to the admission of Mandell's testimony on the ground that a proper foundation had not been laid. He asserted that the 1973 find-

ings would be irrelevant to the condition of the bicycle at the time of the 1971 descent unless accompanied by proof that the bicycle remained unchanged during the intervening twenty months. The Romanos thereupon attempted to establish "no substantial change" in the condition of the bicycle through the testimony of Bart Costerus (Costerus), a mechanical engineer who had examined the Romano bicycle in September 1971. The bicycle was in his possession for approximately three to four weeks. He tested the braking power using a braking force of fifty pounds, Rayna's approximate weight at the time of the accident. Costerus noted that the plastic lubrication cap was missing from the hole in the rear brake hub assembly when he received the bicycle. He testified further that he neither disassembled nor lubricated the braking mechanism.

Costerus first tested the brakes on a hill in Attleboro whose contour was similar to the Bellevue Drive slope. Costerus had attached to the right pedal blocks of steel which approximated Rayna's weight at the time she was injured. The engineer, who weighed 175 pounds, would sit on the banana seat of the "Oxford" and let the bicycle roll down the hill. As the bicycle began to pick up speed, Costerus would keep his feet up in the air, and the fifty-pound weight would cause the right pedal to turn downward and thereby activate the brake. Costerus employed this technique, making some forty descents, thirty-five in Attleboro and five in Cranston on Bellevue Drive. At no time, he reported, was there a "total loss of braking power."

Other testimony also revealed that after Rayna was injured, the bicycle was stored in a basement workroom of the Romano home untouched until Rayna's father delivered it to Costerus for inspection and testing in September 1971. A few weeks later, Rayna's father picked up the bicycle from Costerus and returned it to the basement of the Romano home. Again, it remained there unused until April 1973 when Mandell acquired it for further testing.

Arguing that the tests conducted by Costerus in and of themselves could have deformed the brake's mechanism, the defense attorneys continued to object to Mandell's proffered testimony regarding his observations of the brake's inner workings. The trial justice sustained the objections. The Romanos made several offers of proof intending to establish that the test runs made by Costerus did not deplete the amount of lubricant in the braking system and that evaporation of the oil in the interim between the accident and Mandell's testing was insignificant. The trial justice rejected a final offer of proof by the Romanos relative to the presence within the braking system of dirt and debris which allegedly was sufficient to cause a brake failure. Thereafter, unconvinced that the Romanos had established the necessary similarity of braking conditions, the trial justice directed a verdict for all three defendants.

On appeal, the Romanos argue that in excluding the testimony of their expert, Mandell, the trial justice effectively precluded testimony on the issues of defective design and proximate cause, thus making a directed verdict inevitable. They argue further that the trial justice applied an erroneous standard of admissibility in excluding the testimony of their expert. According to the Romanos, the issue of whether the condition of the brake chamber remained unchanged between the date of the accident and its subsequent examination by Mandell was a question for the jury and not for the trial justice. To support their positions, the Romanos urge us to adopt the standard of "conditional relevancy." Under this theory, all the evidence would have been submitted to the jury who would then decide, under proper instruction, whether the condition of the brake had changed substantially from September 1971 to April 1973. As authority for this proposition they rely primarily upon Fed.R.Evid. 104(b) that provides:

"Relevancy conditioned on fact. When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to,

the introduction of evidence sufficient to support a finding of the fulfillment of the condition."

The standard of admissibility "has been variously referred to as 'some evidence' or 'prima facie' evidence. The important point is that the preliminary fact can be decided by the judge against the proponent only where the jury could not reasonably find the preliminary fact to exist." 21 Wright & Graham, *Federal Practice and Procedure* § 5054 at 269 (1977). The Romanos argue that inasmuch as a prima facie showing of no substantial change was made through uncontradicted testimony, the issue should have been submitted to the jury.

Stated differently, the Romanos contend that because the relevancy of Mandell's examination of the brake's innards depended upon proof of another conditionally relevant preliminary fact—"no substantial change"—both should have been for the jury to decide.

At the outset, we note that the acceptance of Rule 104(b) has been considerably less than universal. Our investigation revealed a lone case in which it was applied but with virtually no explanation. A new trial was ordered because "the Court below may not have followed" the requisite procedure set forth in the rule. *United States v. 478.34 Acres of Land*, 578 F.2d 156, 160 (6th Cir. 1978). One leading treatise considers proof of preliminary questions of fact as "one of the most complex, as well as most common, of evidentiary concepts." It suggests that " 'laying a foundation' for the admissibility of evidence * * * is easier to do if you do not think too much about what you are doing. Thus, Rule 104 may be a provision that is best ignored." 21 Wright & Graham, *Federal Practice and Procedure* § 5052 at 248 (1977). Another legal pundit, after a lengthy discussion highly critical of the conditional relevancy doctrine, concludes that Rule 104(b) is "an obstacle course for judge and jury alike." He declares that it is "based on incorrect analysis; it confuses the issues, invites errors, and should be repealed." Ball, *The Myth of Conditional Relevancy*, 1977 Ariz.

St.L.J. 295, 325. Professor Ball argues that there is "no need to create a special rule to serve as a rescue apparatus to save the law of evidence from * * * mythical dangers." *Id.* at 310. The greater danger, he asserts, is that "once codifiers embark on this false trail, they will find a problem of 'conditional relevancy' behind every tree and will employ their rescue apparatus in a way which will confuse the jury and muddle the administration of the evidence rules far more than letting matters alone would have done." *Id.* at 310–11.

We are not prepared to embrace the doctrine of conditional relevancy as it is set forth in the rule. Indeed, we question how clearly the demarcation between the respective roles of judge and jury would be delineated under the rule. Professors Wright and Graham summarize commentary regarding the viability of Rule 104(b): "In short, about the only good thing that commentators have found in jury determination of preliminary questions is that it is likely to amount to a de facto repeal of the rules of evidence." 21 Wright & Graham, *Federal Practice and Procedure* § 5052 at 249 (1977).

We have not as yet adopted the Federal Rules in this jurisdiction. Instead, we prefer to rely upon our vintage rule that the trial justice must exercise discretion regarding the admissibility of evidence when there has been an objection of irrelevancy. A ruling made under these circumstances would not be reversible error unless the trial justice abused his discretion to the prejudice of the objecting party. *Dixon v. Royal Cab, Inc.*, R.I., 396 A.2d 930, 933 (1979); *Gaglione v. Cardi*, R.I., 388 A.2d 361, 363–64 (1978). On review of the record, we do not find that he abused his discretion.

We allude briefly to decisions in other jurisdictions that have considered the question of admissibility of evidence concerning the condition of machinery subsequent to the time of a mishap. The Supreme Court of Minnesota considered the admissibility of testimony by the plaintiff's expert concerning the condition of a hydraulically regulat-

ed door-closing mechanism. The expert had examined the door controls on the evening preceding the trial, about six months after the accident. The appellate court noted that since the expert's

> "examination of the door was not made until about six months after the accident, and since no previous showing had been made that the door or the door control was in the same condition as just prior to plaintiff's injury, the trial court was of the opinion that the proof offered was too remote. At most, *the reception of such proof was discretionary with the trial court*, and *it was not error to exclude the proffered testimony * * *.*" (Emphasis added.) *Erickson v. Northern Minnesota National Bank*, 235 Minn. 232, 234–35, 50 N.W.2d 489, 491–92 (1951).

In a similar vein, the Supreme Court of Arizona has held that

> "[w]hen the issue is as to the condition of machinery at the time of an accident, it must, of course, appear that it was in substantially the same condition at the time of the test as at the time of the accident. [citation omitted] It is for the court to determine whether this proof has been sufficiently made as a matter preliminary to its introduction, and an appellate court will not question the decision of the trial court unless it appears affirmatively that the rule is violated. [citation omitted] The best method of proof, of course, is to show by competent witnesses that the object which has been tested has at all times been in the possession of the witnesses, so that it would have been impossible for the condition to be changed. Contrary to the opinion of many counsel, this extent of proof, however, is not absolutely necessary. The mere possibility that other persons may have had access to the object so that it might have been changed does not render the result of the test inadmissible, but merely goes to the weight to be given it by the jury. [citations omitted] *The result in each case must be determined by the evidence offered and the sound discretion of the trial court.*" (Emphasis added.) *Broderick v. Coppinger*, 40 Ariz. 524, 526–27, 14 P.2d 714, 715 (1932).

Turning to our own case law, we have long recognized the doctrine that conditions existing at the time of a mishap must be similar to those subsequently proved and that these evidentiary rulings are within the discretion of the trial justice. In *Laporte v. Cook*, 22 R.I. 554, 555, 48 A. 798, 799 (1901), we said that the trial justice could properly refuse to admit testimony concerning the weight of sand that had allegedly fallen on the plaintiff until proof fixed the exact time that the sand was removed. The sand taken from the trench "some time after the accident" did not suffice. *Id.* at 555, 48 A. at 799. We have also found error when "photographs taken of the remnants of the wrecked wagon nearly three years after the accident" were admitted into evidence. We predicated our ruling on the premise that the remnants were not "in the same condition as they were immediately after the collision." *Souza v. United Electric Railways Co.*, 51 R.I. 124, 127, 152 A. 419, 420–21 (1930).

■ Accordingly, we hold that the trial justice did not commit reversible error in excluding the testimony on the issues of defective design and causation because, as a matter of discretion, he concluded that the condition of the brake when examined by the Romanos' expert in 1973 was not substantially the same as it had been on September 9, 1971, the day Rayna was injured. Here, Mandell was prepared to testify that the 1971 malfunction was due to a lack of oil and the presence of dust in the brake's chamber. However, having in mind that there was no evidence in regard to the temperature in the area where the bicycle was stored during the twenty-month hiatus between Costerus's forty descents and Mandell's inspection, the trial justice was obviously dubious about how much of the dirt found by Mandell came about as a result of Costerus's experiments,[2] and he was also

2. Rayna's grandmother testified that after she and her husband had told the salesman that

they were looking for an "appropriate" bicycle for "a little boy" "going on five," they pur-

unsure that the oil level in the brake chamber was the same in 1973 as it had been on the evening when the bicycle plunged down Bellevue Drive.

On this record and in light of the views expressed herein, we cannot fault the trial justice's refusal to allow Mandell to testify concerning the findings he made as a result of his 1973 examination of the coaster-brake portion of the "Oxford."

Accordingly, the plaintiffs' appeal is denied and dismissed, the judgment appealed from is affirmed, and the case is remanded to the Superior Court.

chased a "small two-wheeler." It is obvious that the 225-pound load that the two-wheeler carried during Costerus's experiments gave rise to many of the trial justice's doubts that the oil and grime levels had remained substantially unchanged from the time of Rayna's injury to the time when Mandell examined the braking mechanism.