OPINION
SHEA, Justice.
This case is before the Supreme Court on appeal by the defendants, Perry Wheeler (Wheeler) and James Allen (Allen), from their convictions in Superior Court after a jury trial. The defendants had been indicted by a grand jury on three offenses: involuntary manslaughter as a result of criminal negligence during the commission of a lawful act in violation of G.L.1956 (1981 Reenactment) § 11-23-3; conspiracy to commit involuntary manslaughter in violation of § 11-1-6; and knowingly giving a false statement with the intent to mislead in violation of § 11-18-1.
On appeal defendants urge several grounds for reversal. We need consider only two. First, defendants argue that the trial justice committed error in permitting the introduction of evidence of voice identification by means of spectrographic analysis. Second, defendants argue that the trial justice erred in denying their motions for judgments of acquittal. We reverse the convictions and remand the case to the Superior Court with direction that judgments of acquittal be entered for both defendants.
The events giving rise to this prosecution are somewhat involved, requiring a rather lengthy narration of the evidence presented at trial.
On December 2, 1980, at approximately 3 a.m., the body of Lloyd Fowler (Fowler) was found in a lot between Niantic Avenue and Dewey Street in the city of Cranston, just over the Cranston-Providence city line. The medical examiner testified that Fowler had died from aspiration of regurgitated stomach contents (inhalation of vomit), which event was secondary to acute combined-drug intoxication. Toxicological studies revealed a blood-alcohol level of .32 and the presence of oxycodone (Percodan) and diazepam (Valium). The medical examiner gave his opinion, and the state specifically argued, that Fowler did not die where his body was found. Evidence was presented indicating that Fowler’s body had been dragged to the place where it was found from Niantic Avenue. The medical examiner was not able to give an opinion about the time or manner of death, whether from natural causes, homicide, suicide, or accident. There was evidence that Fowler was so debilitated from alcohol that he lacked the “gag reflex” that would have enabled him to cough and to clear his bronchial passages.
The evidence established that for the last several years of his life, Fowler had been disabled by a severe chronic back problem from which he suffered constant pain. Two surgical procedures had not resulted in any relief. Fowler took Percodan and Valium on a daily basis, both drugs having been prescribed by his physician. At times he took as many as eighteen Percodan tablets a day. He had difficulty walking and always used a cane.
Fowler also had a serious drinking problem. The day before his death he had been drinking. He had left his home on Marion Avenue in Providence in the early evening hours after dinner. Fowler’s son, Steven, met his father, who was then intoxicated, sitting on the sidewalk on Broad Street in *1385 front of Burns’ Donut Shop, not far from their home. Steven helped his father across the street to Doorley’s Tap, a place that Fowler frequented quite regularly. This incident occurred at approximately 6:30 p.m. Fowler had several drinking companions around that day, one of whom was Bobby Herron, who lived on Verndale Avenue in Providence. At approximately 7:30 p.m. Steven returned to Doorley’s Tap but found that his father was not there. Steven testified that when he had met his father earlier that evening, Fowler had mentioned killing himself and had stated his reason that his (Fowler’s) mother had recently suffered a stroke. Fowler had shown Steven his bottles of pills, Percodan and Valium.
Later that evening, at 12:31 a.m., the Providence police department received a telephone call reporting a man lying on the sidewalk at Miller and Broad Streets. That man was Lloyd Fowler, although his identity was not ascertained until his body was discovered in Cranston. He was intoxicated and either unconscious or asleep.
The Providence police dispatcher contacted car No. 11, operated by defendant Wheeler. Wheeler was directed to Miller and Broad Streets. Before Wheeler arrived at the scene, two other uniformed patrolmen, Timothy O’Brien and Henry Roy, arrived there and observed Fowler lying on the grass on his back, snoring. He did not have his cane with him. At 12:36 a.m., and again at 12:40 a.m., O’Brien called for a wagon or a van and cruiser No. 1 responded, operated by defendant Allen. Wheeler arrived at the scene just before O’Brien summoned the wagon. At about 12:42 a.m. the sleeping or unconscious Fowler was placed in the wagon by Roy, Allen, and Wheeler. Both Wheeler and Allen notified the Providence dispatcher that they were on their way to St. Joseph’s Hospital.
At about 12:42 a.m. Officer Searles heard Allen’s announcement on the radio in his vehicle, and he also drove to the hospital. At the emergency room entrance he met Wheeler and Allen standing at the open wagon that still contained Fowler, apparently sleeping. Searles thought he recognized Fowler from a prior incident at Door-ley’s Tap and left to try to find out his name and address. Searles testified that although Fowler appeared to be sleeping in the wagon, at no time did Searles come closer than eight feet to the wagon.
Officer Searles called Wheeler on the ear radio at 1:06 a.m. to say that he could not find out who the intoxicated man was or where he lived. Wheeler responded, “[Tjhat’s okay. He sobered up and we dropped him off at Verndale and Bernard [streets in Providence].” There was no record of any patient admission of Fowler at St. Joseph’s Hospital, nor did personnel at the hospital recall seeing Allen, Wheeler, or Fowler that evening.
At 3:02 a.m., December 2,1980, the Cran-ston police dispatcher received a telephone call. The caller, a male who did not identify himself, said that a man was seen lying down near some trailers behind Griggs and Browne, Inc., off Niantic Avenue. The Cranston police discovered Fowler’s body as a result of that call.
The only direct evidence of what occurred between 1:06 a.m. and 3:02 a.m. is contained in four statements given to the Providence and Cranston police, two by Wheeler and two by Allen. These statements were introduced into evidence by the state.
In these statements Wheeler and Allen related that when they had arrived at St. Joseph’s Hospital, Wheeler had obtained ammonia capsules from the emergency room and used them to arouse Fowler, who had not responded to earlier attempts to rouse him by shaking and by striking the bottoms of his feet with a nightstick. With the administration of the ammonia, Fowler became semicoherent and abusive, refused medical aid at the hospital, and yelled and used profanity. The officers then decided to take Fowler to Talbot House, an alcohol-treatment facility. Allen drove the van and Wheeler accompanied him in his own ve- *1386 hide. While they were still on Broad Street, Fowler, who never did identify himself, refused to go to Talbot House or to any other treatment fadlity. He said he had relatives on Verndale Avenue and that he wanted to go there. Allen so informed Wheeler, and they dropped Fowler off at the intersection of Verndale Avenue and Bernard Street. Fowler was last seen staggering down Bernard Street toward the city.
The state introduced into evidence a tape recording of the telephone call to the Cran-ston police department in which the unidentified caller reported a man lying on the ground off Niantic Avenue. The state had caused this tape to be submitted to aural and spectrographic comparison with voice exemplars taken from both Wheeler and Allen. Testimony regarding this spectro-graphic comparison was admitted at trial over defendants’ objections, and the state’s expert testified that in his opinion the speaker was Wheeler. The tape of the call to the Cranston police and the exemplars of defendants were replayed to the jury for its own evaluation. The tape and exemplars are part of the record.
I
VOICE IDENTIFICATION
The first issue we consider is one of first impression. It involves the admission by the trial justice of the evidence of voice identification by means of spectrographic analysis.
At a pretrial voir dire the trial justice heard extensive testimony by experts presented by the state. They included Dr. Oscar Tosí, a professor at the State University of Michigan at Lansing, who was described as a leading authority in this country in the field of acoustics, audiology, and voice identification, and Dr. Henry Truby, holder of a doctorate in acoustic phonetics and chairman of the board of directors of the International Association of Voice Identification, the organization that certifies qualified voice analysts.
The trial justice observed that both men, who had testified extensively in state and-, federal courts, were qualified experts in the complicated field of voice identification. Their names, along with the name of Lieutenant Lance Smrkovski of the Michigan State Police, another state witness, appear in most of the opinions of state and federal courts that have addressed the admissibility of evidence of voice spectrographs. Doctors Tosí and Truby endorsed the qualifications, training, and experience of Lt. Smrkovski, who had worked closely with Dr. Tosí and had published and lectured extensively in the field of voice identification. He also had testified as an expert in twenty states and in one province of Canada. Also, the state presented Dr. Dorothy Troendle, a member of the faculty at Salve Regina College, who had taught at Providence College and at the University of Rhode Island, had earned a doctoral degree, and had specialized in linguistics and trained in the field of voice identification, teaching that subject to police officers and students at Salve Regina. The defense presented Fausto Poza, an electrical engineer, described as being knowledgeable in the field of voice identification, although he had not performed any experimentation of his own but instead had reviewed the results of others’ experiments.
During the two-week voir dire, the trial justice heard extensive testimony concerning the development of the science of voice spectrography. Voice spectrograms are visual representations of the sound produced by the human voice broken down into factors of time, frequency, and energy. The basic scientific theory involved is that every human voice is unique and that the qualities of uniqueness can be electronically reduced to visual representation, that is, voice spectrograms, through a voice spectrograph. Proponents of the theory of voice identification through voice spectro-graphs claim that a person properly trained in the recognition of these qualities can render an opinion about whether two or more voice spectrograms were made by the *1387 same person. A practical description of the spectrograph and its operation is found in Reed v. State of Maryland, 283 Md. 374, 391 A.2d 364 (1978).
“The process involves the use of a machine known as a spectrograph. This machine analyzes the acoustic energy of the human voice into three components— time, frequency, and intensity — and graphically displays these components by generating, through an electric stylus, a series of closely spaced light and dark lines, varying in position, on a sheet of electrically sensitive paper. The resulting graphic representation is what is called a spectrogram or ‘voiceprint.’ It reveals certain patterns or ‘formats’ which correspond to the sounds which are analyzed.” Id. at 377-78, 391 A.2d at 366.
Doctors Tosi and Truby testified that based on their own work in the field and their knowledge of the work of others, identifications made on the basis of voice spectrographs were reliable, assuming the use of properly operating equipment by a qualified examiner and analyst. They also testified that the scientific premises for such identification were accepted by the scientific community.
In their testimony the witnesses discussed certain factors they considered essential to the use of the spectrograph. They emphasized the use of both aural and visual examination of the spectrogram, admitting candidly that any aspect of human activity could produce error, and that none of the experts claimed 100 percent accuracy. They also conceded that the quality of the spectrogram is no better than the ability of the examiner who conducts the test. The examiner would have to be well trained and would have to be given as much time as was necessary to conduct the test. They also stressed the importance of the examiner’s being free to acknowledge that he was unable to make a determination if that was his conclusion in any given case. This freedom to arrive at no conclusion in a given comparison test reduces very substantially the margin of error in voice comparisons.
The defendants argued that speech spectrograph voice identification rests upon the application of newly developed scientific principles, and therefore, its admission into evidence should be governed by the standard enunciated in Frye v. United States, 293 Fed. 1013 (D.C.Cir.1923). In that case the court said:
“Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.” Id. at 1014.
The Frye test, so-called, is frequently cited and discussed in connection with the admission of scientific evidence. It is, however, widely criticized by many opinion writers and commentators.
“General scientific acceptance is a proper condition for taking judicial notice of scientific facts, but it is not a suitable criterion for the admissibility of scientific evidence. Any relevant conclusions supported by a qualified expert witness should be received unless there are distinct reasons for exclusion. These reasons are the familiar ones of prejudicing or misleading the jury or consuming undue amounts of time.” McCormick, Handbook of the Law of Evidence § 203 at 608 (3d. ed. Cleary 1984).
Conversely, the Frye test has been defended on the premise that it
“protects prosecution and defense alike by assuring that a minimal reserve of experts exists who can critically examine the validity of a scientific determination in a particular case. Since scientific proof may in some instances assume a *1388 posture of mystic infallibility in the eyes of a jury of laymen, the ability to produce rebuttal experts, equally conversant with the mechanics and methods of a particular technique, may prove to be essential.” State v. Williams, 4 Ohio St.3d 53, 56-57, 446 N.E.2d 444, 446 (1983) (quoting United States v. Addison, 498 F.2d 741, 744 (D.C.Cir.1974)).
In this jurisdiction, we have been open to evidence of developments in science that would tend to assist the trier of fact. “This court has never been hostile to the proof of fact by evidence relating to scientific tests or experiments.” Powers v. Carvalho, 109 R.I. 120, 125, 281 A.2d 298, 300 (1971). The law and practice of this state on the use of expert testimony has historically been based on the principle that helpfulness to the trier of fact is the most critical consideration.
A trial justice must first consider whether the testimony sought is relevant. Once the question of relevancy has been favorably determined, the evidence ought to be admitted. Relevant evidence is evidence that tends to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would have been without the evidence. Capezza v. Hertz Equipment Rental Corp., 118 R.I. 1, 371 A.2d 269 (1977); McCormick, § 185 at 542. The initial determination of relevancy is left to the trial justice’s discretion. Romano v. Ann & Hope Factory Outlet, Inc., R.I., 417 A.2d 1375 (1980).
After deciding that the evidence is relevant, the trial justice must next consider whether the subject matter is one on which expert testimony is appropriate.
“[Wjhere the subject matter of the testimony is of a mechanical, scientific, professional or like nature, none of which is within the understanding of laymen of ordinary intelligence, and where the witness seeking to testify possesses special knowledge, skill or information about the subject matter acquired by study, observation, practice or experience, then such an individual’s opinion may be heard as an aid to the jury in its quest to discover the truth.” Morgan v. Washington Trust Co., 105 R.I. 13, 17-18, 249 A.2d 48, 51 (1969).
The trial justice, in exercising his discretion to admit evidence by way of expert testimony, must reach his decision after giving due consideration to the “natural tendency of jurors to place greater weight on the testimony of one qualified as an expert. His decision must reflect his belief that the value to be derived from the proposed testimony * * * justifies the admission of the opinion evidence.” Id. at 18, 249 A.2d at 51. The qualifications of an expert witness is a matter also addressed to the discretion of the trial justice, and absent a showing of abuse this court will not disturb that exercise of discretion. State v. Fogarty, R.I., 433 A.2d 972 (1981); Leahey v. State, 121 R.I. 200, 397 A.2d 509 (1979). The trial justice must also consider the helpfulness of the actual testimony, and in that connection we have required that the expert opinion be of “substantial probative value.” Montuori v. Narragansett Electric Co., R.I., 418 A.2d 5, 10 (1980).
In reviewing the cases around the country, both state and federal, we note that the majority of circuit courts that have considered the admission of spectrographic evidence have decided in favor of its admission.[1]
Several of our sister states have considered this issue and decided in favor of admission. We note that the Supreme Judicial Court of Massachusetts in Commonwealth v. Lykus, 367 Mass. 191, 327 N.E.2d 671 (1975), applied the Frye standard and approved the admission of voice speetro-graphic evidence, stating that “[ljimited in number though the experts may be, the requirement of the Frye rule of general *1389 acceptability is satisfied, in our opinion, if the principle is generally accepted by those who would be expected to be familiar with its use.” Id. at 203, 327 N.E.2d at 677.
The Supreme Judicial Court of Maine in State v. Williams, 388 A.2d 500 (Me.1978), which had adopted a state code of evidence fashioned after the Federal Rules of Evidence, nevertheless concluded that
“[t]he controlling criteria regarding the admissibility of expert testimony, so long as the proffered expert is qualified and probative value is not substantially outweighed by the factors mentioned in Rule 403, [considerations of prejudice, confusion, or waste of time] are whether in the sound judgment of the presiding Justice the testimony to be given is relevant and will assist the trier of fact to understand the evidence or to determine a fact in issue.” Id. at 504.
In that case the court approved the admission of speech-spectrograph-voice-identification evidence based on their own precedents, which are entirely consistent with our case law.[2]
On the record before us, it is clear from the well-reasoned decision of the trial justice ordering the admission of the evidence of the voice spectrographic identification that he carefully considered all of the criteria under our settled case law and reached a correct conclusion. At trial the attorneys for defendants had the opportunity to cross-examine the experts and question the correctness of their conclusions. And it remained for the jury to reject the voice-identification evidence for any number of reasons, including the view that the spectrographic-voice-identification techniques were either unreliable or misleading. State v. Williams, 4 Ohio St.3d at 59, 446 N.E.2d at 448. We conclude, therefore, that the trial justice properly admitted the evidence of voice identification.
The only remaining issue we'need consider, which is dispositive of the case, is whether defendants were entitled to judgments of acquittal.
II
MOTION FOR JUDGMENT OF ACQUITTAL
The defendants argue that the denial of their motions for judgment of acquittal in regard to all counts was error. We agree.
The only question before the trial justice, when such a motion is made, is whether the evidence presented by the state is capable of generating proof of guilt beyond a reasonable doubt. State v. Lillihridge, R.I., 454 A.2d 237, 239 (1982). The trial justice, and this court on appeal, must view the evidence in the light most favorable to the state, without assessing its credibility or weight, and must draw from such evidence all reasonable inferences that are consistent with the guilt of the accused. State v. Giordano, R.I., 440 A.2d 742, 746 (1982); State v. Smith, 121 R.I. 495, 496, 401 A.2d 41, 42 (1979).
Applying these standards, we conclude that the motions for judgment of acquittal should have been granted. In our opinion, the evidence in the record does not warrant conclusion, beyond a reasonable doubt, that on December 2, 1980, defendants conspired to commit negligent homicide, more precisely, involuntary manslaughter.
The evidence most favorable to the state was as follows. In the early morning hours of December 2, 1980, defendants were dispatched to Miller and Broad Streets in Providence to assist a “man down.” The man was Lloyd Fowler. Fowler was transported to St. Joseph's Hospital in the custody of defendants. *1390 Fowler was observed by Officer Searles in the police van at the emergency-room entrance of St. Joseph’s Hospital at approximately 12:42 a.m. Searles was informed by Wheeler over the police car radio at 1:06 a.m. that Fowler had sobered up and had been dropped off at the corner of Yerndale Avenue and Bernard Street in Providence. At approximately 3 a.m. that morning, as a result of an anonymous phone call to the Cranston police, the body of Lloyd Fowler was found. The medical examiner pronounced Fowler dead at the scene at approximately 4 a.m. The time and place of death could not be established, and what occurred in the intervening hours is open to speculation.
The state advances the theory that defendants knew or should have known that Fowler was in grave danger, requiring medical treatment, and that their election to leave St. Joseph’s Hospital constituted criminal negligence. From this basic theory the state moves on to infer a connection, based in large part upon the evidence of the anonymous phone call, between defendants’ actions after leaving the hospital and the subsequent discovery of Fowler’s body in Cranston. Such an inference appears to us to be purely speculative. “Proof based on conjecture and speculation does not support a criminal conviction.” In re Derek, R.I., 448 A.2d 765; 768 (1982); see State v. Distante, 118 R.I. 532, 539, 375 A.2d 212, 216 (1977). There is no evidence to connect either defendant with Fowler from 1:06 a.m. on December 2, 1980, until approximately 3 a.m. when, according to the voice-print experts, Wheeler called the Cranston police. The medical examiner testified that the cause of Fowler’s death was aspiration of his own stomach contents secondary to acute combined-drug intoxication. It was his opinion that Fowler did not choke and die where he was found. The death could have occurred at any time, even before Fowler reached the hospital or while he was outside the emergency room. Neither the exact time nor the manner of death could be determined. The medical examiner found no evidence of major trauma.
In order to sustain an involuntary manslaughter conviction, the criminal negligence must be the proximate cause of death. Wharton’s Criminal Law and Procedure, Manslaughter § 296 at 621 (1957). Criminal culpability premised on a failure to provide medical attention requires that proximate causation be established; it must appear that decedent’s death was imputable to such failure, or that life might have been prolonged if proper medical attention had been provided. State v. Lowe, 66 Minn. 296, 68 N.W. 1094 (1896). If death was not proximately caused by the accused’s failure to provide medical attention, there can be no conviction. Neveils v. State, 145 So.2d 883 (Fla.Dist.Ct.App.1962). Since the state was unable to establish the time and place of death and since the death resulted from the inhalation of stomach contents secondary to acute drug intoxication, a nontraumatic and nonviolent cause of death, the necessary proximate causation was not established.
The state has the burden of proving beyond a reasonable doubt all of the essential elements of the offenses with which defendants are charged. An essential element of proof is that defendants’ acts caused the victim’s death. The defendants cannot be held criminally responsible unless there is a causal connection between their negligence and the death that ensued. The state has failed to prove a causal connection.
The state also relies on G.L.1956 (1984 Reenactment) § 40.1-4-10 for the proposition that defendants breached their statutory duty to provide medical care and that their nonfeasance resulted in criminal responsibility. That section, commonly referred to as the “alcoholism statute,” is found in chapter 4 of title 40.1, entitled “Mental Health, Retardation and Hospitals.”
Title 40.1 was designed to decriminalize alcoholism and provide proper treatment *1391 for those individuals habitually misusing alcohol. Section 40.1-4-10 contains certain guidelines for the treatment and services for intoxicated persons and persons incapacitated by alcohol and essentially provides that (1) if an intoxicated person, whose mental or physical functioning is substantially impaired, is found in a public place and appears to be in need of help, with consent, the police may assist that person to his home or to a treatment facility; (2) if the person is incapacitated by alcohol, that is, unconscious or whose judgment is impaired, the police shall take that person into protective custody and deliver him to a treatment facility for emergency treatment.
In addition, the state introduced into evidence portions of the “Police Alcohol Problems Handbook,” which purports to interpret the alcoholism statute but in fact sets somewhat different standards for dealing with incapacitated persons. Specifically, it gives officers the option of taking incapacitated persons home, to a detoxification program, or to an emergency room. According to the handbook, only “fully unconscious” persons should be taken to an emergency room. The handbook, or training manual, attempts to define the role of the policeman in dealing with the alcohol-troubled person and points out the inherent difficulties in assessing the degree of drunkenness or incapacitation. The manual also emphasizes that if the individual insists on being taken home, then home is where he should be taken unless he lives alone or his family does not want him there.
If a legal duty exists by statute or regulation, it must be one that does not admit of any discussion about its obligatory force. Where doubt exists in regard to the proper course of action, the law does not impute guilt to anyone in a situation in which a choice of one course of action over the other results in fatal consequences.
As the defense has argued, title 40.1 is not a criminal or penal statute because no sanctions are attached for its violation. Clearly, then, any act or omission under title 40.1 cannot result in criminal liability. These materials were relevant only insofar as they set a standard of care, the breach of which may be evidence of negligence. The ultimate question was whether defendants so deviated from this standard of care as to warrant their being held criminally liable for the consequences of their actions. If, as set forth in both defendants’ statements introduced into evidence by the state, Fowler was awake and vociferously refusing treatment, a determination to leave the hospital and to take Fowler to a detoxification center or to Verndale Avenue where Fowler claimed he had relatives, however much hindsight might call that determination a mistake of judgment, can hardly be found to have been a gross deviation from the standard of care imposed on policemen to hold defendants criminally liable.[3] More must be shown to support a manslaughter conviction than a mistake of judgment. Whether Wheeler and Allen were negligent in dealing with Fowler comes down to a question of what they believed, in their professional judgment, and how they exercised that judgment. Reviewing the evidence on this point in a light most favorable to the state, we find that there is nothing to impeach defendants’ asserted good-faith judgment and nothing to suggest that their belief was grievously unreasonable.
Even if we accept as a fact that Wheeler was the anonymous caller, as we must under the motion for judgment of acquittal standard, that fact does not support a presumption of criminal negligence unless a rational connection exists between the fact proved and that presumed. See In Re Vincent, 122 R.I. 848, 413 A.2d 78 (1980). The law does recognize various presumptions that have a particular appli *1392 cation to homicide cases, such as situations in which there is evidence of the use of a deadly weapon, the striking of a blow, or the fact of a killing. See Wilson v. United States, 162 U.S. 613, 16 S.Ct. 895, 40 L.Ed. 1090 (1896). On this record, however, there is absolutely no evidence of foul play. The medical examiner testified that Fowler died of aspiration secondary to drug-related causes. No one is able to say with any degree of certainty when or where the death occurred. The fact that the caller identified the whereabouts of Fowler’s body was simply too tenuous to permit a reasonable inference of criminal negligence. The established facts do give rise to a great deal of speculation about what did occur, some of which reflect unfavorably on these police officers. However, there must be more than speculation between the facts proved and those presumed.
Since the evidence fails to establish that the defendants were guilty of involuntary manslaughter and conspiracy to commit involuntary manslaughter, the charge of filing a false police report also fails of proof. There is a complete lack of evidence which would establish the alleged falsity of the reports given by the defendants to the Providence and Cranston police departments. Consequently, the defendants in the circumstances of this case were entitled to judgments of acquittal.
For the reasons stated, the defendants’ appeals are sustained, the judgments of conviction are reversed, and the case is remanded to the Superior Court with direction that judgments of acquittal be entered for both defendants.
The Chief Justice participated in the oral argument and in the decision of the court, but he did not participate in the publication of the formal opinion.

. See generally United States v. Williams, 583 F.2d 1194 (2d Cir.1978); United States v. Jenkins, 525 F.2d 819 (6th Cir.1975); United States v. Baller, 519 F.2d 463 (4th Cir.1975).

. See generally State v. Fogarty, R.I., 433 A.2d 972 (1981); Allen v. State, R.I., 420 A.2d 70 (1980); State v. Benton, R.I., 413 A.2d 104 (1980); State v. Porraro, 121 R.I. 882, 404 A.2d 465 (1979); Markham v. Cross Transportation, Inc., 119 R.I. 213, 376 A.2d 1359 (1977); State v. Vargas, 118 R.I. 113, 373 A.2d 150 (1977); Anderson v. Friendship Body and Radiator Works, Inc., 112 R.I. 445, 311 A.2d 288 (1973); Corning Glass Works v. Seaboard Surety Co., 112 R.I. 241, 308 A.2d 813 (1973).

. It is noteworthy that Fowler's friend Bobby Herron, with whom Fowler had been drinking earlier in the day, lived on Verndale Avenue. The defendants could not have known this fact since Fowler’s identity had not been ascertained.