**Roger H. PECKHAM**

v.

**T. Donald HIRSCHFELD.**

**No. 88–196–A.**

Supreme Court of Rhode Island.

Feb. 28, 1990.

G. Quentin Anthony, Sheffield & Harvey, Newport, for plaintiff.

Richard Fisher, Joseph J. Macioci, Macioci & Fisher, Newport, for defendant.

## OPINION

FAY, Chief Justice.

This case comes before this court on appeal by the defendant from a Superior Court judgment in favor of the plaintiff and on cross-appeal by the plaintiff regarding the trial justice's restriction of the jury's award to him. We affirm the trial justice's decision and deny the defendant's

appeal. The plaintiff's cross-appeal is denied and dismissed.

On October 12, 1984, plaintiff, Roger H. Peckham (Peckham), filed a complaint in Newport Superior Court against defendant, T. Donald Hirschfeld (Hirschfeld), alleging slander of title and claiming compensatory and punitive damages. The plaintiff alleged that Hirschfeld knowingly and intentionally placed a cloud on the title of his land by recording a purchase-and-sale agreement when, in fact, he was aware that said agreement was null and void.

In November 1987 the case was tried and the events leading up to the controversy were described as follows. In March 1979 the parties entered into a purchase-and-sale agreement whereby plaintiff agreed to sell his property to defendant for $750,000. The agreement set forth an installment sale with monthly payments scheduled over two years. Peckham received regular monthly payments until December 1980, when Hirschfeld presented Peckham with an extension option and told him he would not make anymore payments unless Peckham signed it. Hirschfeld's reasons for asking for the extension were based on his difficulty in obtaining tenants and zoning permits for his planned shopping center. Hirschfeld testified that although he had the monthly payment with him when he visited Peckham in 1980, he did not give it to him. Peckham did not sign the extension. Hirschfeld testified that Peckham told him that he needed to talk to his lawyer and banker before he could sign it. Peckham determined, though, that he wanted the contract considered null and void. He went to his realtor and asked her to sell his land for him. She told him that his land could not be sold until he notified Hirschfeld that his option was void. Peckham had her send a letter on his behalf to Hirschfeld informing him his option was void and that he was "not in a financial position to renew [the] contract and further option for said land."

Peckham had several discussions with Hirschfeld in the following year regarding the sale of his property. In June 1981 the parties met on Peckham's property. According to Peckham, Hirschfeld said, "Roger, if you don't sell me your land or you sell it to anyone else, I will prolong any * * * development there for years, * * * I am a younger man than you and I can wait." Hirschfeld, on the other hand, recalled that Peckham told him at that meeting that he really had to sell the property, that he was not a young man anymore, and he did not know if he would still "be around" a year from then. Peckham told him that Hirschfeld was a young man and would probably be there long after he was gone. Hirschfeld remembered saying to Peckham that he certainly hoped he would be around for a number of years.

Subsequently, after consulting Peckham's realtor, Hirschfeld made Peckham a cash offer for $400,000 with $10,000 down. The offer was not accepted. In September 1981 a meeting took place at Peckham's counsel's offices. Peckham's realtor, lawyer, and his niece and her husband joined Hirschfeld and Peckham to discuss the offer. According to Hirschfeld, the original contract was not discussed.

Rita A. Breen, Peckham's niece, was present at the September 1981 meeting. According to her, the original contract of March 1979 was discussed. Peckham's lawyer asked Hirschfeld about the payments Hirschfeld missed after December 1980. Rita Breen remembered that Hirschfeld told Peckham's lawyer that he did not make the payments because he could not get the main store for his shopping center, and he therefore did not want to tie the land up for Peckham. She was quite sure he said this because she took some notes during that meeting.

In November 1981 Hirschfeld made another offer for the property for $500,000. After some discussion with Peckham's lawyer, he changed the offer to $525,000 plus a $50,000 cash deposit. By February 1982 this offer had not been accepted. Hirschfeld testified that in his last conversation with Peckham's lawyer he had a suspicion that they were looking for another buyer and were keeping him in the background.

At the end of March 1982 Hirschfeld filed the original purchase-and-sale agree-

ment in the records of land evidence of the town of Middletown. He had no knowledge of any dealings between Peckham and third parties regarding the property. He stated that it was "absolutely not" his intention to hurt Peckham financially. When asked why he filed the agreement, he testified:

> "The only thing in my mind was I wanted to build this shopping center. I owned the property next door and I had a distinct interest in what was built next to it. I had discussed the purchase of the land for eight or nine years with Roger [Peckham]. Even prior to the '79 signing of the contract I spent months, maybe even close to a year negotiating the purchase price and ability to get a contract. After not being able to get any kind of amiable agreement to resolve it, I felt my only recourse was to enforce my right under the contract."

On cross-examination Hirschfeld admitted that he need not have recorded the contract in the land evidence record to determine its enforceability. He stated that he believed that by recording the agreement, he would get the attention of the owner of the property. He did admit that when he recorded the agreement, he knew that it would put a cloud on the title.

Peckham entered into an agreement for the sale of his property to a third party on May 26, 1982, for $530,000. The agreement provided that the parties were to close on September 2, 1982. The closing did not take place, however, until February 24, 1983. According to the attorney representing the prospective purchaser, Hirschfeld's recording of the purchase-and-sale agreement had put a cloud on the title, significantly delaying the closing. After the attorney had informed Peckham of this fact, Peckham filed suit in June 1982 to determine the validity of the agreement and to clear the title to his property. Hirschfeld counterclaimed for specific performance.

On December 14, 1982, while the title dispute was pending, Peckham obtained title insurance by signing an indemnification agreement, making an immediate transfer of the property possible despite the pending litigation. The closing did not take place immediately because the purchaser's financing arrangements were still incomplete. The closing finally took place on February 24, 1983.

On January 12, 1984, the Superior Court entered judgment in favor of Peckham, and the title to his land was declared free from all claims of defendant, Hirschfeld. The agreement of March 1979 was declared null and void. Hirschfeld appealed the judgment, and after he was directed to show cause, his appeal was dismissed by this court on September 27, 1984.

The trial of the slander-of-title case commenced on November 3, 1987, and the jury awarded plaintiff $21,664.72 in compensatory damages and $25,000 in punitive damages on November 6, 1987. On January 29, 1988, defendant's motion for a new trial was denied. Hirschfeld's renewed motion for a directed verdict was also denied because the trial justice had already entered judgment in the case for the nonmoving party. The trial justice had originally reserved a ruling on defendant's motion at trial but impliedly denied the reserved motion when he failed to rule on it before he entered judgment. On February 12, 1988, defendant appealed the judgment to this court. The plaintiff filed a cross-appeal on February 25, 1988.

The defendant raises several issues on appeal. He alleges that insufficient evidence was presented on all the elements of slander of title to support the jury verdict, that the trial justice erroneously instructed the jury on punitive damages, and that the trial justice erred in awarding attorney's fees for the quiet-title action without requiring any evidence of reasonableness. Other issues brought up on appeal can be disposed of summarily.

The elements necessary to prove slander of title were first set forth in *Hopkins v. Drowne*, 21 R.I. 20, 41 A. 567 (1898). Relying on *Hopkins*, we recently stated that in order to recover for slander of title, a plaintiff must show "that the defendant maliciously uttered false statements about the plaintiff's ownership of

real estate which resulted in the plaintiff sustaining an actual pecuniary loss." *De-Leo v. Anthony A. Nunes, Inc.,* 546 A.2d 1344, 1346 (R.I.1988). In *Hopkins* the term "malice" was described as "an intent to deceive or injure; and in order to constitute it there must be a false statement, it must be made with full knowledge of its falsity and for the purpose of injuring the plaintiff." *Hopkins,* 21 R.I. at 23, 41 A. at 568. In the instant case, the trial justice, in his jury charge, stressed the necessity that plaintiff was required to show that defendant knew the recorded statement was false at the time he filed it:

> "The mere filing or the claiming of an interest in the land evidence records does not constitute proof, even if the claim was subsequently determined to be an invalid claim. You must be convinced on the evidence that it was false, that he knew it was false when he published it, and that he did it intending to harm Mr. Peckham, and that Mr. Peckham, sustained special damages as a result of that publication.

> \*   \*   \*   \*   \*   \*

> "The fact that subsequently the claim of the defendant was determined not to be a valid claim does not make the recording an improper recording or improper publication. You must determine if on the day that it was published, there is evidence before you that it was made in good faith, asserting a claim to the title to the real estate or was it made by this defendant knowing that there was no valid claim there, and made maliciously with a motive to hurt the interests of Mr. Peckham."

The defendant argues in his brief that plaintiff did not prove the elements of slander of title because he did not show that there was knowledge on the part of defendant of the falsity of the instrument recorded and that plaintiff did not prove special damages. The record, however, is replete with evidence sustaining the jury's finding that defendant had knowledge of the falsity of the recorded instrument. Malicious motivation for the recording of the purchase-and-sale agreement can be in-ferred from Hirschfeld's statement to Peckham warning him that he would prolong any development on Peckham's land if he did not sell it to him or if he sold it to anyone else. In *Hopkins* we stressed that express malice need not be proved in a slander-of-title case and may properly be "inferred from the language used or the character of the act committed." *Hopkins,* 21 R.I. at 23, 41 A. at 568.

The mere fact that a person asserts a claim to the property that is unfounded does not warrant a presumption of malice, but a plaintiff "must also show that the defendant could not honestly have believed in the existence of the right he claimed, or at least that he had no reasonable or probable cause of believing so." *Id.* at 25, 41 A. at 569.

The jury had enough evidence before it to conclude that Hirschfeld had no reasonable cause to believe the agreement was still valid. He had stopped making the agreed-upon payments. He had also received notice from Peckham that he should consider the agreement null and void. Hirschfeld effectively agreed that the original contract was invalid when he stated, after he had stopped making the payments, that he did not want to tie up the land for Peckham. Furthermore, Hirschfeld made several attempts to negotiate new contracts, which makes it difficult to accept his contention that he honestly believed he had enforceable rights under the original contract. Although Hirschfeld claimed that it was not his intention to hurt Peckham financially, he testified that he was aware that Peckham was having some financial difficulties and that he knew that recording the agreement would put a cloud on the title. He admitted that when he recorded the agreement, the "only thing in [his] mind was [that he] wanted to build this shopping center."

For the reasons stated above, we find that there was enough evidence before the jury from which it could conclude that defendant acted with malice and with knowledge that the agreement was unenforceable when he recorded it. In addition we find that plaintiff did meet his burden of

proving special damages as a result of defendant's actions.

■ Peckham presented ample evidence from which the jury could conclude that he sustained actual pecuniary loss as a result of Hirschfeld's malicious recording of the contract. Peckham had entered into an agreement with a third party regarding the sale of his property, and the closing date had been determined to be September 2, 1982. The closing was delayed and the property's vendibility was impaired because of the purchaser's inability to get clear title. At the time, Peckham's daily interest payments on a $180,000 note issued by Rhode Island Hospital Trust National Bank were $98.63. Peckham also had two outstanding loans with the Island Trust Company, one for $30,000 and one for $36,000, with daily interest rates at $15.61 and $16.76, respectively. A third note from Peckham to his lawyer and a Thomas L. Trout in the amount of $18,000 had a daily interest rate of $9.86. In addition, Peckham would have had $260,000 to deposit in the bank on September 2, 1982, according to his agreement with the third-party purchaser, which would have earned him interest on that amount starting September 2, 1982, instead of February 24, 1983. Peckham was also obligated to employ an attorney to litigate the action to clear the title to his property and to pay additional taxes plus interest on his property to the town of Middletown. The jury correctly considered all these factors in awarding Peckham compensatory damages.

■ The trial justice instructed the jury that damages flowing from the delays in arranging financing after Peckham obtained title insurance were not compensable because Hirschfeld's false publication was not the proximate cause of damages stemming from further delay. The plaintiff argues on cross-appeal that the trial justice erred in giving this instruction and that plaintiff should have been awarded damages up to February 24, 1983, the date plaintiff finally closed on the sale of the property with the third-party purchaser. Clearly after Peckham obtained title insurance, the impairment to the vendibility of the property was removed. Special damages "are the actual, but not the necessary, result of the injury complained of." *See* Black's Law Dictionary 354 (5th ed.1979). The damages Peckham sustained after he obtained title insurance rendering his property vendible were not the actual result of Hirschfeld's putting a cloud on the title but, rather, were directly caused by the third-party purchaser's inability to have his financing arrangement completed.

Hirschfeld's arguments claiming that the trial justice committed reversible error in denying his motions for a directed verdict and a new trial can be summarily dismissed on the basis of our opinion as set out above.

■ Hirschfeld also argues that Peckham should have been collaterally estopped from bringing the slander-of-title claim because it should have been brought up as a compulsory claim or counterclaim in the underlying action to quiet title. This argument lacks merit since plaintiff could not have claimed slander of title until the recorded document had been found to be false.

■ We now turn to the issue of punitive damages. Hirschfeld argues that the trial justice erred in ruling that punitive damages were warranted in this case. We disagree.

■ Although the court determines whether a case is a proper one for a punitive-damages award, it is discretionary with the jury to award such punitive or exemplary damages. *See Sherman v. McDermott*, 114 R.I. 107, 108–09, 329 A.2d 195, 196 (1974); *Hopkins v. Drowne*, 21 R.I. at 28, 41 A. at 570.

The *Sherman* case involved a civil action for assault and battery and false imprisonment. The issue at hand was whether the trial justice had erred in finding that there was insufficient evidence to warrant an exercise of his discretion regarding a punitive-damages award. *Sherman*, 114 R.I. at 109, 329 A.2d at 196. This court ruled that the plaintiff's request for punitive damages should have been considered by the court at its discretion. We pointed out that as-

sault and battery and false imprisonment were torts that involved such maliciousness, wantonness or willfulness " 'on the part of the party at fault, as amounted to criminality, which for the good of society and warning to the individual, ought to be punished.' " *Id.* (quoting *Adams v. Lorraine Mfg. Co.*, 29 R.I. 333, 338, 71 A. 180, 182 (1908)). When the jury in this case returned a verdict including punitive damages, it exercised its discretion to punish defendant.

■ In general, we have held that we shall allow punitive damages only when the defendant has acted maliciously or in bad faith. *See Morin v. Aetna Casualty and Surety Co.*, 478 A.2d 964, 967 (R.I.1984); *Carvalho v. Coletta,* 457 A.2d 614, 616 (R.I.1983); *Berberian v. New England Telephone & Telegraph Co.*, 117 R.I. 629, 633–34, 369 A.2d 1109, 1112 (1977).

It is apparent that the standard we have articulated for punitive damages was met in this case, relying on the evidence submitted to the jury. Hirschfeld knew that he had not made the required payments under the agreement. He also had received the letter from plaintiff expressly terminating their agreement. Finally, defendant exhibited an intent to keep the property from being developed by anyone else. These facts were sufficient for a jury to award punitive damages, even though the facts may not display so strong a pattern of harassment on the part of defendant as we found in the *DeLeo* case. In *DeLeo* the property owner's attempts to subdivide and develop his property were thwarted by the defendant's efforts to interfere physically with the construction of the parcel. He also called the police, complained to the press, objected to every step of the development process, and in fact specifically claimed that he had an interest in a portion of the owner's property. *DeLeo,* 546 A.2d at 1346. Notwithstanding the fact that the case before us does not exhibit the same kind of harassment on the part of defendant, punitive damages were warranted since the jury found that defendant maliciously interfered with plaintiff's ownership of real estate.

■ The defendant's next assignment of error concerns the trial justice's award of attorney's fees to plaintiff for the underlying action to quiet title. Hirschfeld argues that the award of attorney's fees as an element of damages in the slander-of-title action is inappropriate because no evidence was presented that they were reasonable.

The Restatement (Second) of Torts provides:

"(1) The pecuniary loss for which a publisher of an injurious falsehood is subject to liability is restricted to * * * (b) the expense of measures *reasonably* necessary to counteract the publication, including litigation to remove the doubt cast upon vendibility or value by disparagement." (Emphasis added.) Restatement (Second) *Torts* § 633 (1977).

The defendant is correct in his observation that the record is devoid of any discussion regarding the reasonableness of the attorney's fees incurred in the quiet-title action. The attorney employed in plaintiff's quiet-title action did, however, testify at some length regarding the services he performed and the bill he subsequently submitted to Peckham in that case. The plaintiff's use of the bill as a full exhibit was objected to by defendant. The defendant objected to the bill on the basis of its relevancy, believing these fees would not be encompassed in the area of special damages incurred by plaintiff. The trial justice denied the objection but noted defendant's exception. No objection was made to the reasonableness of the fees.

According to Rule 51(b) of the Superior Court Rules of Civil Procedure:

"No party may assign as error the giving or the failure to give an instruction unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of the party's objection."

This court, however, will not use rigid adherence to Rule 51(b) as a vehicle for overlooking trial errors. *Brodeur v. Desrosiers,* 505 A.2d 418, 422 (R.I.1986). For this reason, although defendant did not object to the reasonableness of the attorney's

fees, we shall still look at whether the trial court erred. We find that no error was committed.

In *Colonial Plumbing & Heating Supply Co. v. Contemporary Construction Co.*, 464 A.2d 741 (R.I.1983), we held that the factual issue of what is a reasonable fee required particular facts in the form of affidavits or testimony upon which the trial court could base a decision. In the instant case, testimony by the attorney who represented plaintiff in the quiet-title action established the criteria on which the fee award was based.

However, we have held in a workers' compensation case that independent evidence of the reasonableness of the charges is required before recovery can be had for the cost of medical services. *See Mastronardi v. Zayre Corp.*, 120 R.I. 859, 864, 391 A.2d 112, 116 (1978). We noted that "reasonableness of the charges was part of the employee's prima facie case and the employer's failure to object to the testimony regarding those charges did not relieve the employee of her obligation to establish that element of [the] case." *Id.* at 865, 391 A.2d at 116. Similarly, in the instant case plaintiff failed to carry his burden of proof regarding the reasonableness of the attorney's fees, but defendant did not object and raise the issue of reasonableness at trial. We have generally held that "an objection must be 'properly taken to a ruling by the trial court on a motion clearly and expressly stated.' *Cavanagh v. Cavanagh*, 118 R.I. 608, 625, 375 A.2d 911, 919 (1977); *Manekofsky v. Baker*, 92 R.I. 377, 380, 169 A.2d 376, 378 (1961)." *Romano v. Ann & Hope Factory Outlet, Inc.*, 417 A.2d 1375, 1377 (R.I.1980).

The defendant in this case, however, did not make the trial justice aware with reasonable clarity that he objected to the reasonableness of the attorney's fees. He therefore cannot preserve this issue on appeal. Upon closer scrutiny our comments in *Mastronardi* may well have resulted in "sandbagging," and to that extent we depart from *Mastronardi*. Accordingly we dismiss the defendant's appeal regarding the reasonableness of attorney's fees.

For the reasons stated, the defendant's appeal is denied and dismissed. The plaintiff's cross-appeal is also denied and dismissed. The case is remanded to Superior Court for entry of judgment consistent with this opinion.