DECISION
This case is before the Court for decision following a non-jury trial on a complaint by plaintiff Riverside Burial Society of Pawtucket that seeks to establish title to a portion of land owned by defendants J. Martin Chitwood[1] and Faye B. Zuckerman under theories of adverse possession and acquiescence based on a longstanding irregular line of ten to twelve Canadian hemlock trees. By counterclaim, the defendants seek a declaratory judgment that their deed for the subject premises, that comports with the surveyed boundary line agreed to by the parties, is a valid and complete description of the property and that the adverse possession and acquiescence claims advanced by plaintiff are invalid. They also seek damages against plaintiff for alleged slander of title and intentional interference with contractual relations.
For the reasons set forth in this Decision, this Court resolves the disputed title question in favor of the defendants and grants their request for a declaratory judgment. This Court denies plaintiff's claims based on the theories of adverse possession and acquiescence and also denies defendants' claims for slander of title and intentional interference with contractual relations.
 Facts/Travel
Plaintiff, Riverside Burial Society of Pawtucket ("plaintiff"), owns residential property located at 745 Pleasant Street in the City of Pawtucket, Rhode Island that it leases to third parties and which is designated as Lot 857 on Tax Assessor's Plat 66 (Lot 857). Plaintiff is a Rhode Island corporation that operates the Riverside Cemetery across the street from its residential rental property. It acquired the residential property in 1983 by deed from May-Day Realty Corporation. (Pl.'s Ex. 2D). Both of those corporations are family businesses that were operated previously by Joseph M. Davis — the father of the President and General Manager of the plaintiff corporation, Polly Stiles ("Stiles"). Stiles lives further down Pleasant Street from plaintiff's residential rental property.
Defendants J. Martin Chitwood ("Chitwood") and Faye B. Zuckerman ("Zuckerman") (collectively "the defendants") own undeveloped property that abuts the plaintiff's property and that is designated as Lot 954 on Tax Assessor's Plat 66 (Lot 954). The northerly portion of plaintiff's real estate borders the southerly portion of defendants' real estate, with both lots bordering Pleasant Street to the east.
The property in dispute in this case is a narrow strip of defendants' land measuring approximately six feet wide by one hundred fourteen feet long that runs along the northern edge of plaintiff's property. There are approximately ten to twelve Canadian hemlock trees located in an irregular line on the disputed portion of the property at issue. Stiles believes that these trees were planted by her late father, Joseph M. Davis, sometime after the 1938 hurricane because similar trees exist in the cemetery. The trees are estimated to be between 50 and 60 years old. Lot 954 (defendants' undeveloped property) and Lot 955 (residential property that is currently owned by Charles Donmoyer (Donmoyer") and that borders defendants' Lot 954 to the north) originally were part of a larger parcel of land owned for a substantial period of time by the Nickerson family. (Donmoyer Dep. 6/28/99 at 16-17.) The Nickerson family was very friendly with the neighboring Davis family in the years before and after the trees were planted. In 1987, Nancy Nickerson sold these two properties as "buildable lot[s]" to Donmoyer. Id. at 17. At the time of this sale, there was a two-family dwelling on Lot 955, which was designated as 733 Pleasant Street. Id. at 18. From 1987 to 1994, Donmoyer resided in the house located at 733 Pleasant Street that he still owns. Id. In August 1990, Donmoyer sold Lot 954 (the undeveloped lot) to the defendants, although he maintained a right of first refusal to repurchase the property on terms identical to those governing the sale to defendants. (Pl.'s Ex. 2B.) Both the deed that reflects this conveyance and the deed conveying the adjacent residential lot to plaintiff in 1983 make no reference to the tree line as the boundary line between Lot 954 (defendants' undeveloped lot) and Lot 857 (plaintiff's property). (Pl.'s. Ex 2C). Donmoyer represented to the defendants at the time of the sale that the undeveloped lot was a buildable lot.
The westerly edge of Lot 954 (defendants' undeveloped property) abuts Lot 957 on Tax Assessor's Plat 66 (Lot 957) — — land located at 26 Newman Road in Pawtucket, Rhode Island where defendants resided from 1989 until 1998. The northern boundary of Lot 957 (defendants' former residential property) also abuts the southern boundary of plaintiff's residential property (Lot 857) with both lots bordering Newman Road to the west.
Around June 1989, after she learned that defendants had purchased the abutting residential property on Newman Road (Lot 957), Stiles ("Stiles") hired a surveyor to survey the Newman Road line of Lot 857 (the residential property owned by plaintiff). At this time, Stiles proceeded to place a new marker to divide plaintiff's property from defendants' abutting property, and she told the defendants that she was doing so because the prior marker had been disturbed. Stiles did not inform the defendants at this time that she considered the hemlock trees to be located on plaintiff's property.
In 1995, Zuckerman and Stiles had a conversation regarding defendants' plan to install a stockade fence on their property. Zuckerman informed Stiles that the placement of the fence was meant to prevent defendants' young children from running out onto Newman Road. The defendants installed a stockade fence that ran several feet from the boundary line between the properties of the parties, as indicated by survey, and well inside the line of hemlock trees.
In the fall of 1997, the defendants decided to sell both their residential property (Lot 957) and their adjacent undeveloped property (Lot 954). Defendants approached Donmoyer to ascertain whether he wanted to exercise his right of first refusal to purchase the property. (Donmoyer Dep. at 33.) Lacking the necessary financing for the purchase, Donmoyer was unable to exercise his right of first refusal. Id. at 28. After several unsuccessful months of trying to market the properties together, the defendants opted to market the two lots separately. Within days, on August 8, 1998, defendants entered into a purchase and sale agreement with Thomas Getz and Betty Finn for the sale of their residential property (Lot 957).
Subsequently, in January 1999, defendants hired R.C. Cournoyer Enterprises, Inc. to survey their remaining undeveloped lot (Lot 954). During an on-site visit, Mr. Cournoyer met Stiles. It was during this meeting that Stiles learned that the defendants were conducting a survey of the property in anticipation of the sale of the lot. It also was at this time that Stiles said she first discovered that defendants' undeveloped property (Lot 954) was separate from their residential property (Lot 957).
Within the same month, Stiles encountered at the site two other men who identified themselves as Douglas Cuddeback (Cuddeback), the prospective buyer of defendants' undeveloped property (Lot 954), and his builder. Cuddeback and his builder told Stiles that the survey conducted a month before that date indicated that the hemlock trees were located on defendants' undeveloped lot (Lot 954). Moreover, Cuddeback stated that he intended to cut down the trees after purchasing the property because the trees obscured the lot. Stiles asserted that the trees could not be cut down because they were located on plaintiff's property and belonged to plaintiff.
Immediately after this encounter, in a letter dated January 28, 1999, Stiles notified Coleman Realtors, the defendants' realtor, of her intent to challenge the survey, particularly the "accuracy of the boundaries and the ownership of the trees on the southern border." (Pl.'s Ex. 3.) She further wrote that the letter placed the realtors on notice that any transfer of the property "before a resolution to the challenged survey, will result in legal action against you." Id.
On February 6, 1999, Cuddeback made an offer to the defendants to purchase Lot 954 for $45,000 and tendered a $500 deposit with the offer. The written offer stated that the purchase price was $35,000, subject to Cuddeback securing financing and surveying the lot lines prior to the signing of the purchase and sale agreement. (Defs.' Ex. F.) The parties drafted a purchase and sale agreement but never signed it. Due to the boundary dispute, the defendants never completed the sale of the property, and they returned the $500 deposit to Cuddeback.
On or about March 1999, Stiles retained Stanley Engineering to perform another survey of the disputed lot line. Similar to the survey conducted by Cournoyer, the Stanley survey confirmed that only one of the trees actually lay on the true boundary line between the plaintiff's and the defendants' properties while the rest were located on the defendants' property. On April 4, 1999, Stiles sent Donmoyer a facsimile inquiring about Donmoyer's right of first refusal and stating that she was contesting ownership of the hemlock trees that she claimed formed the northern boundary of her property. Donmoyer responded that he "would be interested in dividing the spare lot only and sharing the cost three ways if it can be done." There were no further discussions, however, regarding the possible joint purchase of Lot 954 by Stiles and Donmoyer.
On June 1, 1999, plaintiff filed a complaint in Superior Court requesting that it be decreed the owner of the disputed portion of land pursuant to the doctrines of adverse possession and acquiescence. That same day, plaintiff filed a notice of lis pendens in the Pawtucket Land Evidence Records contesting the boundary line based only on the doctrine of adverse possession. Defendants responded by filing a counterclaim against plaintiff by which they sought damages, inter alia, for alleged slander of title and intentional interference with contractual relations. This decision follows the non-jury trial of plaintiff's complaint and defendants' counterclaim.
 Standard of Review
In a non-jury trial, "the trial justice sits as a trier of fact as well as law." Hood v. Hawkins, 478 A.2d 181, 184 (R.I. 1984). "Consequently, [s]he weighs and considers the evidence, passes upon the credibility of the witnesses, and draws proper inferences." Id. "The task of determining the credibility of witnesses is peculiarly the function of the trial justice when sitting without a jury." Walton v. Baird, 433 A.2d 963, 964 (R.I. 1981). "It is also the province of the trial justice to draw inferences from the testimony of witnesses . . . ." Id. See alsoRodriques v. Santos, 466 A.2d 306, 312 (R.I. 1983) (the question of who is to be believed is one for the trier of fact).
 PLAINTIFF'S COMPLAINT Adverse Possession
It is undisputed by the parties in this case that, in accordance with their respective surveys of the disputed property and their respective deeds, the Canadian hemlock trees at issue exist in an irregular line on the defendants' property (with the exception of the tree nearest Pleasant Street that exists on the boundary line). Notwithstanding the surveys and deeds, plaintiff argues that it adversely possesses that portion of defendants' land upon which the hemlock trees are located. Plaintiff asserts that it has continuously and uninterruptedly used and maintained the area in dispute for a period of time far in excess of the statutory requirement of ten years. See R.I. Gen. Laws § 34-7-1 (1956). Plaintiff insists that its adverse possession of that portion of land began at the time the hemlock trees were planted (not only on this property but on its cemetery property across the street) — — sometime after the hurricane of 1938.
Defendants counter that the plaintiff has failed to meet the stringent requirements that are required by the Rhode Island Supreme Court to establish adverse possession of disputed land. See Sherman v. Goloskie,95 R.I. 457, 188 A.2d 79 (1963). The defendants argue that the evidence offered by plaintiff in support of its claims fails to prove each of the elements of adverse possession by clear and convincing evidence.
It is well-settled in this state that "[e]stablishing title to real property by way of adverse possession is a statutorily created right."Walsh v. Cappuccio, 602 A.2d 927, 930 (R.I. 1992). The adverse possession statute provides:
 [w]here any person or persons, or others from whom he, she, or they derive their title, either by themselves, tenants or lessees, shall have been for the space of ten (10) years in the uninterrupted, quiet, peaceful and actual seisin and possession of any lands, tenements or hereditaments for and during that time, claiming the same as his, her or their proper, sole and rightful estate in fee simple, the actual seisin and possession shall be allowed to give and make a good and rightful title to the person or persons, their heirs and assigns forever; and any plaintiff suing for the recovery of any such lands may rely upon the possession as conclusive title thereto, and this chapter being pleaded in bar to any action that shall be brought for the lands, tenements or hereditaments, and the actual seisin and possession being duly proved, shall be allowed to be good, valid and effectual in law for barring the action.
R.I. Gen. Laws § 34-7-1 (1956).
According to the Rhode Island Supreme Court "to establish adverse possession under § 34-7-1, a claimant's possession must `be actual, open, notorious, hostile, under claim of right, continuous, and exclusive.'" Locke v. O'Brien, 610 A.2d 552, 555 (R.I. 1992) (quotingSherman v. Goloskie, 95 R.I. at 465, 188 A.2d at 83 (1963)). In the seminal case of Anthony v. Searle, our Supreme Court recently expounded on several of the basic requirements required to prove a claim for adverse possession, as follows:
 The elements of "actual" and "continuous" possession are successfully established when the claimant shows that "the use to which the land has been put is similar to that which would ordinarily be made of like land by the owners thereof. Additionally, the continuity of the possession must be sufficient to signal the true owner of the land that a claim of title contrary to his own is being asserted." The "notorious" and "openness" elements are established by a showing that "the claimant goes upon the land openly and uses it adversely to the true owner. The owner then becomes chargeable with knowledge of what is done openly on the land." A claimant makes a showing that the possession was "hostile" if a determination is made "that the possession of the occupier is to a visible line in all events regardless of the location of the true boundary line."
681 A.2d 892, 897-898 (R.I. 1996) (citations omitted). The Supreme Court opined "that the ultimate fact to be proved in adverse possession is that the claimant has acted toward the land in question `as would an average owner, taking properly into account the geophysical nature of this land.'" Id. (quoting Gammons v. Caswell, 447 A.2d 361, 367 (R.I. 1982)).
Further, under Rhode Island law, "[a] claimant must establish the indicia of adverse possession for a period of ten years." Locke, 610 A.2d at 555 (citing R.I. Gen Laws § 34-7-1 (1956)). Finally, "[e]vidence of adverse possession must be proved by strict proof, that is proof by clear and convincing evidence of each of the elements of adverse possession." Locke, 610 A.2d at 555 (citing Samuel Nardone Co. v.Bianchi, 524 A.2d 1114 (R.I. 1987); Spangler v. Schaus, 106 R.I. 795,264 A.2d 161 (1970)). Thus, adverse possession must be established "by a preponderance of clear and positive evidence or by evidence that is unambiguous and affirmative in character." Hilley v Simmler, 463 A.2d 1302, 1304 (R.I. 1983).
There have been several jurisdictions that have analyzed claims of adverse possession based on tree lines on property. See, e.g., Andersonv. Hudak, 907 P.2d 305 (Wash.Ct.App. 1995) (holding that the plaintiff failed to prove hostile possession of land on which she planted a line of trees, necessary to establish adverse possession, where the record was devoid of evidence of affirmative acts on her part, throughout the statutory period, to maintain or cultivate the trees or land around them after they were planted); Shoemaker v. Houchen, 994 S.W.2d 40 (Mo. 1999) (holding that an adverse possession claim fails where the record is devoid of any evidence that the plaintiffs or their predecessors in title had occupied, used, or otherwise exercised control over property north of a tree line); Striefel v. Charles-Keyt-Leaman P'ship, 733 A.2d 984 (Me. 1999) (holding that the owners of a parcel of land whose boundary was embedded in a tree line met all of the requirements to establish title to the parcel through adverse possession because they had openly and notoriously treated the parcel as their own property by raking, mowing and trimming the land, storing wood on it and gardening on the parcel);Otto v. Cornell, 349 N.W.2d 703 (Wis. 1984) (holding that the plaintiff established adverse possession of a parcel of land to the tree line based on his open, legally hostile, and notorious acts, including planting ornamental trees on the land and maintaining the area around them for more than 25 years).
In Anderson v. Hudak, 907 P.2d at 404, the Washington Court of Appeals stated that "[e]videntiary difficulties arise in proving that one own er `possesses' or `uses' a line of trees to the exclusion of another." The court further explained that usage of trees that would support a claim of adverse possession "included acts such as clearing land, mowing grass and maintaining shrubs and plants." Id. The court noted, however, that the "planting of trees alone, without some use that is open and hostile, does not satisfy the elements of adverse possession." Id. at 404.
In Otto v. Cornell, 349 N.W.2d at 705, the claimant mistakenly planted a line of maple trees to mark the boundary between his lot and that of his neighbors. The Supreme Court of Wisconsin held that there was sufficient evidence to support the claim of adverse possession, including proof that the claimant had planted the trees with the intention of marking the boundary, that he replaced one of the trees that had been destroyed with another tree, and that he continuously claimed, maintained and occupied the land around the trees for more than two decades and even posted a thermometer on one of the trees. Id. at 706.
Although our own Supreme Court has yet to directly address the issue of tree line disputes under the doctrine of adverse possession, language from the Court's decision in Anthony v. Searle, 681 A.2d 892 (R.I. 1996), is instructive. In Anthony, the Rhode Island Supreme Court wrote that "cultivating land, planting trees, and making other improvements in such a manner as is usual for comparable land have been successfully relied on as proof of the required possession." 681 A.2d at 898 (citations omitted). Anthony thus suggests that our Supreme Court, like the courts of other jurisdictions, would require proof of maintenance or usage of the trees or an area around them in addition to their mere planting, for the requisite statutory period, to establish adverse possession based on a tree line.
In the instant case, plaintiff relies on the testimony of a number of witnesses who have had a long history with the property in question to support its claim that it adversely possessed that portion of defendant's property upon which the hemlock trees are located. The first witness to testify on plaintiff's behalf was Polly Stiles, President and General Manager of the plaintiff business. Stiles stated that she believed that the hemlock trees were planted by her father on plaintiff's nearby cemetery property as well as along the northern boundary line of Lot 857 soon after the hurricane of 1938. Since that time, Stiles maintains that members of her family and plaintiff's employees have maintained and cared for the hemlock trees at both sites. While acknowledging that she lived on the property for only a brief time in 1960 and that she was absent from the area for approximately two decades thereafter, Stiles claims that she never saw the defendants or anyone else care for the trees. Stiles further testified that she hired F.A. Bartlett Tree Expert Co. ("Bartlett") to spray the trees from 1993-1999 when she noticed a white wooly substance on them.
Moreover, Stiles asserts that she had a conversation with defendant Zuckerman that suggests that the defendants impliedly recognized the trees as existing on the plaintiff's property. Stiles claims that she spoke with defendant Zuckerman before spraying the trees to assuage any concerns Zuckerman might have had regarding the safety of spraying given the presence of defendants' young children. Stiles maintains that she told Zuckerman not to worry because no chemicals were being used in the process.
Stiles also claims that when defendants decided to erect a fence on their property, her conversation with defendant Chitwood further confirms their alleged mutual understanding that the trees were on plaintiff's property. She testified that defendant Chitwood spoke with her regarding the boundary line between their properties because defendants did not want any confusion regarding the boundary line after the fence was erected. According to Stiles, the eventual placement of the fence "north of the trees" is evidence that defendants considered the hemlock trees to be plaintiff's property or to be located on plaintiff's property.
At trial, plaintiff took the position that the substantial period of time that had elapsed since the trees were planted, combined with the care and maintenance of the trees undertaken by plaintiff and its predecessors since the planting, confirms that plaintiff has adversely possessed the land upon which the trees are located. In this regard, plaintiff called Patrick Gildea ("Gildea"), a thirty-five year employee of Bartlett, to testify at trial and to introduce into evidence company records documenting work performed on the trees for plaintiff. Gildea testified that work, such as annual pruning, was performed on the trees located both on Lot 857 and on the cemetery grounds across the street. In addition, a printout provided by Bartlett chronicles the work performed by the company from 1993-1999. While the printout describes the location of the work as only the cemetery property, its narrative suggests that Bartlett also performed work for the Riverside Cemetery at plaintiff's residential rental property at 745 Pleasant Street to protect the trees in the cemetery. A typical entry for these years reads: "Spray[ed] hemlock trees on cemetery grounds and hemlock trees around #745 Pleasant Street (across from entrance to cemetery) to control hemlock wooly adelgid infestations." (Pl.'s Ex. 6.)
Joseph M. Davis, Jr. ("Davis"), brother of Stiles, also testified regarding the maintenance and care of the hemlock trees at 745 Pleasant Street where he lived only briefly. Davis recalled that he worked at the cemetery as a young man. He also testified that, at his father's direction and in association with his work at the cemetery, he would clip dead branches from and rake under the subject hemlock trees. In addition, Davis testified that he never saw others maintaining the trees in question.
Gregory Nelson ("Nelson"), who currently serves on plaintiff's Board of Managers and Board of Trustees, also testified on behalf of the plaintiff. Nelson testified that in 1963, while in high school, he worked for the plaintiff at the cemetery digging graves, mowing, raking and cleaning. He stated that in 1963, he raked under the line of trees on the property in dispute, mowed grass on both sides of the trees, and raked over the cut grass.
Plaintiff avers that the testimony of these witnesses, combined with the company records provided by Bartlett, proves its claim of adverse possession. Plaintiff argues that its evidence tends to show that plaintiff "has acted toward the land in question as would an average property owner taking properly into account the geophysical nature of this land." Anthony v. Searle, 681 A.2d at 898 (R.I. 1996).
In contrast, the defendants offered testimony that directly conflicts with the testimony provided by plaintiff's witnesses. Defendant Chitwood testified, directly contrary to Stiles, that he maintained and cared for the disputed property upon which the hemlock trees are situated. He stated that he mowed his lot, including the area on which the trees are located, and also cleaned around the trees. In addition, although Chitwood acknowledges having had a conversation with Stiles regarding the placement of the fence on his property, he asserts that the discussion was meant as a courtesy rather than as a method of establishing the boundary line. He further maintains that he erected the fence to prevent his young children from accessing Newman Road and to avoid a dispute over the boundary line with Stiles. In addition, defendant Zuckerman denies having had any conversation with Stiles regarding the hemlock trees or the safety of spraying them.
The defendants also submitted a letter to them from Clement Desjardins, a licensed arborist and employee of Samuel Kinder 
Bros., Inc. ("Kinder") of Bristol, Rhode Island, in response to their questions regarding the state of the hemlock trees. (Defs.' Ex. E.). The conclusion stated in the July 16, 1999 letter to defendants from Kinder further contradicts the testimony of Stiles:
 [t]hese trees have not been cared for either consistently or continuously. If care has been provided it has been wholly ineffective. Pruning has been limited to lower branches without interfering with nearby structures. Thorough pruning has not been done at any time within the last 8-10 years, if at all.
Id.
Finally, the deposition testimony of Charles Donmoyer offered by the defendants further contradicts the testimony of plaintiff's witnesses. Donmoyer stated that he was never informed that the trees on the disputed property belonged to plaintiff or that the trees were on plaintiff's property. (Donmoyer Dep. on 6/28/99 at 25-25.) He also testified that during the time he lived at 733 Pleasant Street, he maintained and cared for the adjacent undeveloped lot, including mowing and raking under the hemlock trees on the side nearest his property. Id. at 14. Donmoyer asserted that he never saw anyone from Bartlett or any of plaintiff's employees ever caring for or maintaining the hemlock trees on the disputed property. Id. at 25 and 40.
Even assuming that this Court were to view the evidence in plaintiff's case in a light most favorable to the plaintiff, the plaintiff has failed to establish ownership of the disputed portion of land by adverse possession. As stated previously, to succeed on a claim of adverse possession, a plaintiff must prove that possession of the disputed property is "actual, open, notorious, hostile, under claim of right, and exclusive" for the requisite statutory time period. Sherman v. Goloskie,
95 R.I. at 465, 188 A.2d at 83 (1963).
In the instant case, Stiles testified that she believed that her father planted the trees in question. There is no direct evidence, however, that any predecessor in title to plaintiff, including her father, planted the trees. While there may be circumstantial evidence of that fact based on the age of the trees, her father's botany background and the presence of similar trees on the plaintiff's cemetery property, there is no evidence that plaintiff or its predecessors planted the trees with the specific intent to establish a boundary line dividing the plaintiff's property from the property adjacent to it. There likewise is no evidence that the Nickersons (who owned the adjacent undeveloped lot at the time) assented explicitly or implicitly to their planting as establishing the boundary line. Indeed, the Davis family was very friendly with the Nickerson family at the time the trees were planted and thereafter. In addition, the 1983 deed transferring title to the residential property to plaintiff does not reference the tree line as the boundary line.
Furthermore, plaintiff's witnesses testified only to sporadic periods of maintenance and care of the hemlock trees and the disputed property upon which the trees are located after the trees were initially planted. Mr. Nelson, who is currently on the Board of the plaintiff's business, only could testify as to a single year, decades ago, of maintenance of the trees in question. Mr. Davis, brother of Stiles, testified to similar maintenance activity but could not identify when, during his youth, he did lawn work around the trees. Most of his work occurred at the cemetery. While the company records provided by Bartlett suggest that Stiles may have had certain trees sprayed after she noticed a wooly white substance affecting them, these records do not define the trees with any precision and suggest that the spraying was done at the request and for the benefit of the Riverside Cemetery. Significantly, the records only cover a period of seven years from 1993 to 1999, thereby falling short of the mandated statutory period of ten years to prove adverse possession.See R.I. Gen. Laws 1956 § 34-7-1.
More importantly, plaintiff's evidence failed to establish exclusive care and maintenance or possession of the trees by plaintiff or its predecessors that was hostile to the abutting property owners. There is no evidence of any fact or event that would have put the defendants or their predecessors in title (including Donmoyer or the Nickersons) on notice of plaintiff's position that the hemlock trees were on its land.
This Court finds, therefore, that even when the evidence in plaintiff's case is marshaled in its favor, the plaintiff has failed to carry its burden of proving adverse possession of the disputed property by clear and convincing evidence. Plaintiff has failed to prove by clear and convincing evidence that it had open, actual, notorious, hostile, continuous and exclusive possession of the disputed land for a period of at least ten years, as required by R.I. Gen. Laws § 34-7-1. Absent that proof, plaintiff's adverse possession claim must fail.
Moreover, when the credibility and weight of the evidence in plaintiff's case is considered, together with all evidence in the case, the deficiencies in plaintiff's claim of adverse possession are even more apparent. This Court did not find Stiles' testimony credible regarding the care and maintenance of the trees. She clearly had no direct knowledge or involvement in the maintenance of the trees in question. In fact, she had no concern about this issue generally until the dispute underlying this litigation arose in 1999. This Court likewise can assign little weight to the testimony of plaintiff's other lay witnesses who testified vaguely about maintenance of the trees decades ago, as they were affiliated closely with plaintiff and Stiles and had memories that were hampered by the passage of time. In addition, this Court was not convinced, particularly in light of the letter from defendants' expert, Clement Desjardins, and notwithstanding the Bartlett tree maintenance records introduced into evidence by plaintiff, that the trees in question (as opposed to other hemlock trees on or around plaintiff's property) had been sprayed by Bartlett from 1993-99. Even if spraying of the subject trees had been done, plaintiff failed to convince this Court that it was performed at the request of plaintiff for the benefit of plaintiff's residential property (as opposed to the Riverside Cemetery), as plaintiff attempted to suggest through the company's records. Stiles' own testimony regarding a conversation with Zuckerman about spraying also was not persuasive.
Furthermore, it was disingenuous of plaintiff to suggest that the defendants' location of the fence on their property was some sort of admission that she owned the trees. They simply wished to avoid a confrontation with a neighbor who they had seen try to mark the property line with a new boulder.
In this Court's view, Stiles was upset about the prospect of development of defendants' undeveloped lot that could jeopardize trees that she loved and thought belonged to her family. Her testimony and presentation of evidence were colored by her view in this regard.
Moreover, plaintiff's claim that the tree line is the boundary line is undermined by the actual survey and the presence of historical markers on the property. Stiles unequivocally testified that she and the Davis family considered historical boundary markers and a survey line to be the definitive statement of a legal boundary. The markers that existed historically on plaintiff's property square with this survey line (notwithstanding Stiles' surreptitious attempt to replace one of those markers); they do not square with the tree line as the boundary line. Indeed, if a straight line is drawn between the marker on Newman Avenue and the marker on Pleasant Street that mark the northeast and northwest corners of plaintiff's property, as shown on plaintiff's survey (Pl.'s Ex. 7), the Canadian hemlock trees in dispute clearly fall in an irregular line to the north of this straight line and rest on the defendants' property.
Furthermore, defendants' predecessors in title clearly viewed Lot 954 (defendants' undeveloped lot) as a buildable lot. Nancy Nickerson (who was friendly with plaintiff's predecessors in title), sold that lot to Donmoyer as a "buildable lot", in accordance with the metes and bounds description in the deed. (Donmoyer Dep. At 17). Donmoyer, in turn, sold the lot to defendants as a buildable lot. Had the lot not been buildable, presumably it could not have been subdivided from the other property owned by Donmoyer and his predecessors in title (Lot 955). The lot only could have been buildable, however, if the survey line, and not the tree line, constitutes the true boundary line.
When the credibility and weight of all of the evidence is assessed by this Court, therefore, it falls far short of being clear and convincing proof of continuous possession of the disputed property on which were planted the Canadian hemlock trees that was active, open, notorious, under claim of right, exclusive and hostile to the defendants and their predecessors in title. Accordingly, plaintiff's claim to the disputed property under the theory of adverse possession must fail. The defendants thus are entitled to judgment as to Count 1 of plaintiff's complaint for adverse possession.
 Acquiescence
Plaintiff next argues, alternatively, that the defendants and their predecessors in title acquiesced to a boundary line that locates the Canadian hemlock trees on plaintiff's property. The defendants advance two distinct theories in response: first, the defendants maintain that the plaintiff has failed to carry its burden of proof on this issue; and second, the defendants argue that the plaintiff abandoned its acquiescence claim given the absence of any reference to a claim for relief under that theory in plaintiff's post-trial memorandum. (Defs.' Reply to Pl.'s Post-Trial Brief at 3.)
The doctrine of acquiescence provides that "owners of adjoining estates are precluded from denying a boundary line recognized by both owners for a length of time equal to that prescribed by the statute of limitations barring a right of reentry." Locke v. O'Brien, 610 A.2d 552, 556 (R.I. 1992). The doctrine allows a plaintiff to gain title to defendant's property "despite the fact that defendant [has] record title." Id. at 555 (citing Paquin v. Guiorguiev, 117 R.I. 239, 366 A.2d 169 (1976)). The "party alleging acquiescence must show that a boundary marker existed and that the parties recognized the boundary for a period equal to that prescribed in the statute of limitations to bar a reentry, or ten years."Id. (citing Peloquin v. Ciaccia, 413 A.2d 799 (R.I. 1980) and R.I. Gen. Laws. § 34-7-1 (1956)). The court may infer the element of boundary recognition from the silence of one party or its predecessor in title who was aware of the boundary. Id.
It is arguable, as defendants suggest, that plaintiff has waived its acquiescence claim by failing to argue the issue in its post-trial memorandum. Its brief discusses only plaintiff's adverse possession claim. Plaintiff also filed its notice of lis pendens exclusively based on the theory of adverse possession, without mentioning a claim of acquiescence.
Assuming that plaintiff's acquiescence claim still pends, the claim by plaintiff that the defendants or their predecessors in title acquiesced to a boundary line that locates the hemlock trees on plaintiff's property must fail for many of the same reasons that plaintiff's adverse possession claim fails. Plaintiff insists that defendants' placement of the stockade fence "north of the trees" evidences the defendants' acquiescence to a boundary line that places the trees on plaintiff's property. The defendants testified convincingly, however, that they built the fence not to set a boundary line but as a means to keep their children contained within their back yard. They chose a location for the fence that was free of tree roots and would not upset Stiles. As previously noted, Stiles' attempt to portray defendants' placement of the fence as establishing the boundary line was unpersuasive.
In addition, this Court finds that neither the defendants nor Donmoyer, their immediate predecessor in title, recognized the hemlock trees as the boundary line between the defendants' undeveloped property (Lot 954) and plaintiff's residential property (Lot 857). The defendants and Donmoyer maintained the area around the trees based either on their correct belief that the trees were located on their own property or out of uncertainty as to the exact location of the property line. They also recognized the undeveloped lot as being buildable (which is not consistent with the tree line forming the boundary) based on the representations of their respective immediate predecessors in title. Significantly, there is no reference to the hemlock trees as a boundary in the March 19, 1983 deed conveying Lot 857 to plaintiff. See Essex v.Lukas, 90 R.I. 457, 464, 159 A.2d 612, 615 (1960) (wherein the Rhode Island Supreme Court upheld a trial justice's determination that there was no "mutual acquiescence" where the trial justice relied to a "great extent on the absence in the 1948 Essex deed of any reference to the hedge in question and also on the fact the premises were conveyed on measurements which did not include the strip of land in dispute"). Furthermore, there is insufficient evidence to establish that the plaintiff's predecessors in title planted the trees to form a boundary with the agreement of the neighboring Nickerson family at the time.
Thus, this Court finds that, even if plaintiff's acquiescence claim is considered, plaintiff has failed to prove that the Canadian hemlock trees are located on plaintiff's property either by express or implied agreement between plaintiff (or its predecessors in title) and the defendants (or their predecessors in title) over the appropriate statutory period mandated by law. Accordingly, the defendants are entitled to judgment as to Count 2 of plaintiff's complaint for acquiescence.
 DEFENDANTS' COUNTERCLAIM Declaratory Judgment
In Count V of their counterclaim, the defendants seek a declaratory judgment establishing their title to the disputed property at issue. Plaintiff argues that the defendants are not entitled to their requested declaratory judgment because plaintiff has title to that disputed land, as alleged in its complaint, under the doctrines of adverse possession and acquiescence.
The defendants rely on a survey line and their deed to establish their title to the disputed property. Plaintiff does not contest the survey line or deed but instead argues that it has title to the disputed property based on the line of Canadian hemlock trees under theories of adverse possession and acquiescence. As previously found by this Court, however, plaintiff has failed to prove these claims in its complaint. Accordingly, the survey line between plaintiff's and defendants' properties (that is agreed upon by the parties) and the defendants' deed control the issue of boundary and title. The defendants are thus entitled to a declaratory judgment and related relief, as requested in Count V of their counterclaim (paragraph 39(a) — (c)), that establishes their title to and ownership of the property at issue in accordance with that survey line and deed.
 Slander of Title and Intentional Interference with Contractual Relations
The defendants argue that by filing a notice of lis pendens on their property with the Pawtucket Land Evidence Records, Stiles slandered the title to their property and intentionally interfered with the prospective sale of defendants' property to Cuddeback. Defendants assert in Count I of their counterclaim for slander of title that Stiles "intentionally and maliciously slandered [defendants'] title to the premises by recording documentation it knew to be false." (Amended Counterclaim at 4.) Defendants also state that "[a]s a direct and proximate result of [plaintiff's] willful slander [defendants] ha[ve] lost the immediate sale of the premises." Id. Defendants further assert in Count II of their counterclaim for intentional interference with contractual relations that plaintiff "filed said false documentation to create a cloud on [defendants'] title thereby inhibiting [defendants'] sale of the premises." Id. The plaintiff responds that the defendants have failed to meet their burden of proof as to either of these claims.
In an action for slander of title, the defendants must establish "that the [plaintiff] maliciously uttered false statements about [its] ownership of real estate which resulted in [their] sustaining an actual pecuniary loss." Montecalvo v. Mandarelli, 682 A.2d 918, 923 (R.I. 1996 (citing Peckham v. Hirschfeld, 570 A.2d 663, 666-67 (R.I. 1990)). Within this context, malice is a "term of art" that requires a showing of "an intent to deceive or injure." Id. The Rhode Island Supreme Court has explained, as follows:
 [t]he mere fact that a person asserts a claim to the property that is unfounded does not warrant a presumption of malice, but a plaintiff `must also show that the defendant could not honestly have believed in the existence of the right he claimed, or at least that he had no reasonable or probable cause of believing so.
Id. (quoting Hopkins v. Drowne, 21 R.I. 20, 23, 41 A. 567, 568 (1898)). "[I]f, however, a party files a notice of a lis pendens absent a good faith belief in his or her claim to the title of the property, then he or she utters a statement knowing it is false and malice may properly be inferred." Id.
In addition, to prevail on a claim of intentional interference with actual or prospective contractual relations, a party must show: (1) the existence of a business relationship or expectancy; (2) knowledge of the relationship or expectancy; (3) an intentional act of interference; (4) proof that the interference caused the harm sustained; and (5) damages.Mesolella v. City of Providence, 508 A.2d 661 (R.I. 1986). The burden of proving sufficient justification for the interference shifts to the defendants after the plaintiff establishes each of these prima facie
elements. Belliveau Bldg. Corp. v. Baldelli, 763 A.2d 622, 627 (R.I. 2000) (citations omitted). The Rhode Island Supreme Court does not require a showing of actual malice or ill will; rather, a showing of legal malice, that is, "an intent to do harm without justification," is sufficient. UST Corp. v. General Road Trucking Corp., 783 A.2d 931, 937 (R.I. 2001) (citing Jolicouer Furniture Co. v. Baldelli, 653 A.2d 740, 753 (R.I. 1995)). To prevail, the claimant ultimately must prove that the defendant acted "without justification" or for an "improper" purpose.Id.
This Court finds that there is insufficient evidence before it to support defendants' claims of slander of title or intentional interference with contractual relations. Stiles testified that she filed the notice of lis pendens to prevent the destruction of the hemlock trees and that she was never motivated by a desire to stop the sale of the defendants' property. Defendants correctly assert that Stiles' belief that the hemlock trees were located on plaintiff's property was unsupported by various surveys conducted of their undeveloped property (Lot 954), including a survey financed by Stiles. Despite the presence of surveys that located the hemlock trees on defendants' property, Stiles nonetheless continued to believe honestly that the hemlock trees were located on and part of plaintiff's property based on theories of adverse possession and acquiescence. Stiles grounded her assertions in her belief that the trees were planted by her father decades ago and maintained by plaintiff and its predecessors in title thereafter. This Court finds that Stiles' belief that the hemlock trees were either located on plaintiff's property or that the hemlock trees constituted plaintiff's property, although mistaken, was held in good faith.
Thus, the defendants have failed to show that in filing the notice of lis pendens, plaintiff acted maliciously or with an intent to do harm to defendants without justification. Accordingly, Count I of defendants' counterclaim for slander of title must fail.
As to defendants' claim of intentional interference with contractual relations, they can prove "the existence of a business relationship or expectancy" between them and a prospective purchaser of the property based on the negotiations between them and Cuddeback for the purchase and sale of Lot 954 for $45,000. Stiles became aware of this business expectancy when she came upon Cuddeback and his builder at Lot 954 and informed them that she was disputing title to that portion of the land upon which the hemlock trees are located. Defendants, therefore, also can prove knowledge by plaintiff of the alleged business relationship or expectancy between the defendants and their prospective purchaser. In addition, Stiles' filing of the notice of lis pendens on the property in the Pawtucket Land Evidence Records could be viewed as an intentional act of interference with that business relationship or expectancy.
The final element of the defendants' claim for intentional interference with contractual relations, however, requires proof that the interference caused the harm claimed by the defendants. This Court finds that there is insufficient evidence of record to show that but for Stiles' filing of the notice of lis pendens, the sale of Lot 954 to Cuddeback would have been accomplished.
Cuddeback testified that but for the dispute regarding the hemlock trees, he would have bought the property. The dispute regarding the location and ownership of the hemlock trees heralded the filing of the notice of lis pendens by Stiles. Even prior to the filing, however, Stiles already had informed Cuddeback of her intention to dispute the survey locating the hemlock trees on defendants' property. This fact is evident in the contract for sale dated February 6, 1999 that stipulates that the agreement is "subject to survey of lot lines prior to signing sales agreement." (Defs.' Ex. D.) In addition, the purchase and sale agreement drawn up between defendants and Cuddeback specifically references the tree line dispute in paragraph 23 entitled "Additional Provisions," which states "Subject to the rights and claims, if any, of Riverside Cemetery to that portion of the Southern boundary." Moreover, the record evidence reveals that Stiles filed the notice of lis pendens
on July 1, 1999 in the Pawtucket Land Evidence Records, whereas Cuddeback testified that defendants returned his $500 deposit to him on May 20, 1999.
Thus, the evidence suggests that the defendants' proposed sale of Lot 954 to Cuddeback failed prior to the filing of the notice of lis pendens
by Stiles. While the boundary dispute that is the subject of this litigation may well have been a dispositive factor in the failure of that sale, this Court is not satisfied, based on the defendants' proof, that the lis pendens itself caused the transaction to fail.
Moreover, the defendants are unable to prove that Stiles acted maliciously in filing the notice of lis pendens. In filing the notice oflis pendens, Stiles was not motivated by "an intent to do harm without justification" or an "improper purpose" but by her desire to preserve the hemlock trees that she honestly believed belonged to plaintiff and were on its land. Accordingly, Count II of defendants' counterclaim alleging intentional interference with contractual relations also must fail.
 Conclusion
For all of these reasons, this Court finds that the plaintiff has failed to show, by clear and convincing evidence, that it has title to the disputed portion of defendants' land on which the Canadian hemlock trees are situated under the doctrine of adverse possession. The plaintiff also has failed to show that the defendants or their predecessors in title acquiesced to a boundary line locating the hemlock trees on plaintiff's property. This Court thus grants judgment in favor of the defendants on plaintiff's complaint and grants defendants the declaratory judgment and related relief they request in paragraph 39(a) — (c) of Count V of their counterclaim, plus costs — — thereby conclusively establishing defendants' title to the disputed property at issue in accordance with the survey line agreed to by and between the parties and the defendants' deed. In addition, this Court grants judgment in favor of the plaintiff as to Counts I and II of the defendants' counterclaim for slander of title and intentional interference with contractual relations. As defendants have not pressed their claims for fraud and attorneys' fees contained in Counts III and IV of their counterclaim, and because this Court's judgment as to defendants' claims for slander of title and intentional interference with contractual relations also controls the disposition of these claims, judgment is also granted in favor of plaintiff as to Counts III and IV of the defendants' counterclaim.
Counsel shall confer and submit to the Court forthwith for entry an agreed upon form of judgment consistent with this decision.
[1] This Court notes that defendant J. Martin Chitwood is also known as John Martin throughout these proceedings.